Argued 23 January, decided 3 April, rehearing denied 29 May, 1906.

### LIVESLEY v. JOHNSTON.

84 Pac. 1044.

APPEAL—SUBSEQUENT WAIVER OR TERMINATION—EVIDENCE DEHORS.

1. Where the controversy has been settled after the entry of the judgment or decree appealed from, or the right of appeal has been in some manner waived, evidence outside the record is admissible to establish the facts as a basis for a motion to dismiss.

APPEAL—DISMISSAL BECAUSE OF NEWLY DISCOVERED EVIDENCE.

2. A motion to dismiss an appeal because of newly discovered evidence material to the cause of the appellant should be overruled, the proper proceeding being by a suit to annul the order appealed from; and a claim of settlement during the trial in the lower court between the respondent and one jointly liable with the appellants, without the knowledge of appellants, and which was concealed from them, is in the nature of newly discovered evidence not justifying a dismissal of the appeal.

SPECIFIC PERFORMANCE—LACHES—HOP ADVANCES.

3. Where a contract for the purchase of hops to be grown required the purchaser to make certain advances "about April 1," and on March 28 he sent the money to the seller, but stopped payment of the checks on the 31st, claiming the payment to have been premature, yet expressing an intention to perform the contract, and on April 4 and on several occasions within the next six months offered to comply with his part of the contract, there was no laches or inequitable conduct barring a suit for specific performance.

EVIDENCE OF SOLVENCY.

4. The evidence is satisfactory that the vendor in the contract in question was not so financially conditioned as that an action against him for damages would have been as effective as a suit for the specific performance of such contract.

SPECIFIC PERFORMANCE—ALTERNATIVE RELIEF OF DAMAGES.

5. Where the defendants in a suit for the specific performance of a contract of sale dispose of the property during the pendency of the suit, equity may retain jurisdiction and award the plaintiff damages in lieu of the article contracted to be delivered.

MEASURE OF DAMAGES AWARDED IN LIEU OF SPECIFIC PERFORMANCE OF CONTRACT TO SELL.

6. Where damages are awarded in place of a decree for specific performance of a contract to sell, the proper amount is what plaintiff would have been entitled to in a law action for damages for breaching the contract.

SALES—MEASURE OF DAMAGES FOR BREACH.

7. In action of damages by a purchaser against a seller for refusing to deliver the property contracted for, the measure of damages is the value of the property at the time of the refusal, less the agreed price to be paid, with interest, which is here an element of damage.

From Marion: GEORGE H. BURNETT, Judge.

Statement by MR. CHIEF JUSTICE BEAN.

On September 5, 1902, the plaintiffs, T. A. Livesley & Co., entered into a contract with the defendant, John Johnston, Jr., by the terms of which the latter agreed to sell and deliver to the plaintiffs and they agreed to purchase 20,000 pounds of hops at 9½ cents a pound, for each of the years from 1903 to 1907, inclusive, such hops to be grown on a yard leased by Johnston from Frank Chappelle and others. The plaintiffs agreed to advance to Johnston on or before April 1st of each year $336, with which to pay the rent of the yard, and $250 "on or about April, May and June," for cultivating purposes, and at or during picking time 4½ cents a pound for picking purposes, the balance of the purchase price to be paid when the hops were delivered to and accepted by the plaintiffs. The contract was

so drawn that the advances made and to be made by the plaintiffs were to become a lien upon the hops. Johnston refused to deliver the hops for the year 1903, and on the 24th of September this suit was commenced against Johnston, Wolf & Son, and the Southern Pacific Co. to compel a specific performance of the contract and to restrain and enjoin the sale or disposition of the hops or their removal from the jurisdiction of the court. In their complaint plaintiffs allege that they were and are ready and willing to perform all the terms and conditions of the contract on their part and tendered and offered to make the advances as stipulated, but that Johnston refused to accept the same and early in the year 1903 notified them that he would no longer be bound by the contract, and would not deliver the hops as agreed upon; that Johnston is insolvent and wholly unable to answer in damages for a breach of the contract. Wolf & Son were made defendants on the ground that they claimed a lien on the hops, and the Southern Pacific Co. because the hops had, prior to the commencement of the suit, been delivered to it for storage and transportation, and were then in its possession. A preliminary injunction was issued as prayed for, restraining the defendants, and each of them, from selling, disposing of, encumbering or removing the hops from the jurisdiction of the court, but a demurrer to the complaint was sustained, and a decree entered dismissing the suit, and dissolving the injunction. From this decree an appeal was taken, and the cause reversed and remanded for such further proceedings as might be deemed proper: *Livesley* v. *Johnston,* 45 Or. 30 (76 Pac. 13, 946, 65 L. R. A. 783, 106 Am. St. Rep. 647). After the mandate had been returned to the court below, the plaintiffs filed a supplemental complaint, setting up the commencement of the original suit, the preliminary injunction, the motion to dissolve such injunction, the demurrer to the complaint, and the rulings thereon, the appeal therefrom, and the decision on such appeal, and averring that after the appeal had been taken and perfected, and a supersedeas bond given, the defendant Johnston, for the purpose of cheating and defrauding the plaintiffs, sold the hops to his codefendants, Wolf & Son, who caused

them to be removed from the State by the defendant the South-
ern Pacific Co.; that the hops were bought by Wolf & Son and
removed by the Southern Pacific Co. for the purpose of defeat-
ing any decree plaintiffs might recover in the suit; and that the
hops so disposed of and removed from the State were of the value
of $5,000, by reason whereof plaintiffs have been damaged and
defrauded out of $3,100 over and above the amount they agreed
to pay therefor.

The defendant Johnston in his answer admits the execution
of the contract as alleged, but denies that plaintiffs have been
ready and willing to perform the contract on their part, or that
they tendered or offered to make the advances as stipulated, or
to perform any of the conditions of the contract; or that he is
insolvent or unable to answer in damages for breach of the con-
tract; admits that he raised 20,000 pounds of hops during the
year 1903, which he delivered to the Southern Pacific Co. for
his codefendants Wolf & Son; but denies that the same was in
contravention of any contractual rights of the plaintiffs.   For
a further and separate defense he pleads a breach by the plain-
tiffs of the stipulation that they would · advance on or before
April 1st of each year money with which to pay rent, and "on or
about April, May and June," money for cultivating purposes,
by alleging that on or about the 2d of April they notified him
that they would refuse to pay the rent or make the required
advances or deal further with him under the contract; that
defendant was without money with which to pay the rent and
was in great peril of losing his lease and suffering great and
irreparable damage, and therefore immediately after the default
of the plaintiffs notified them that he had rescinded the con-
tract and would no longer be bound thereby; that in order to
preserve his rights he was compelled to, and did, borrow of the
defendants Wolf & Son money with which to pay the rent, and
entered into a contract with them for such money as might be
necessary properly to cultivate, harvest and market the crop,
since which time he has had no contractual relations whatever
with the plaintiffs; that up to the time of the default by the
plaintiffs, he was ready and anxious to comply with the contract

on his part, but was prevented ffrom so doing by reason of the refusal of the plaintiffs to make the advances to him as stipulated. He also alleges that he is solvent and has property to the value of $8,200, and is therefore able to satisfy on execution any judgment plaintiffs may secure against him for breach of the contract.

The defendants Wolf & Son admit the execution of the contract between the plaintiffs and Johnston, but deny all other allegations of the complaint on information and belief, and affirmatively allege that on or about April 3, 1903, they loaned Johnston $336 with which to pay the rent on his hopyard, and thereafter, on May 10th, entered into an agreement with him to advance money for the purposes of cultivating, picking, harvesting and marketing the hops; that at the time of making such advances and contract they believed, in good faith, that the agreement between him and the plaintiffs had been lawfully rescinded and the contractual relations terminated; that in pursuance of their agreement and contract with Johnston they have advanced to him from time to time money· for the purposes of cultivating, harvesting and marketing the hops amounting in the aggregate to the sum ·of $1,818.49; that after the preliminary injunction had been dissolved they purchased the hops of Johnston in good faith, believing they had a right to do so, and paid him therefor. Johnston and Wolf & Son joined in an answer to the supplemental complaint in which they admit all the material matters alleged therein except that the acts charged were done with a fraudulent purpose or design.

The Southern Pacific Co. answered the original complaint denying a part of the allegations thereof and alleging that it received the hops from Johnston for Wolf & Son as a warehouseman and common carrier fot the purposes of storage and transportation only, and that it had no other interest therein; that at the time the preliminary injunction was dissolved, the court ruled and so stated in the presence of counsel that it could remove or dispose of the hops as it might see fit, and relying on the order dissolving the preliminary injunction and such opinion and ruling, it did thereafter on or about the ——day of Decem-

ber, 1903, deliver the hops to Wolf & Son upon their demand and that of the defendant Johnston, and thereby parted with the possession and control thereof.

The plaintiffs filed replies to the several answers of the defendants in which they deny the material allegations of such answers and affirmatively allege that on March 28, 1903, they mailed to the defendant Johnston their check on Ladd & Bush, bankers of Salem, for the sum of $336, payable to the owners or lessors of the hopyard, and at the same time a check for $250, payable to Johnston personally on account of advances to be made by them on their contract; that on the 31st of March, they observed that the payment of the $250 to Johnston was premature and so notified him, and stopped payment of the check therefor, but not the check in favor of the owners of the land for rent; that no objection was made by Johnston at any time that the payment of the advances was made by checks and not in money; that at the time the checks were drawn and at all times plaintiffs had and still have sufficient funds in Ladd & Bush's bank to pay such checks; that immediately upon the rendition of the decree dissolving the preliminary injunction, the plaintiffs appealed and served and filed an undertaking for stay of execution; that the sale of the hops by Johnston to Wolf & Son was made after such appeal had been taken and perfected, with full knowledge of the plaintiffs' contention. Upon the issues thus joined the cause was tried and decree rendered in favor of plaintiffs and against the defendants jointly for the sum of $2,500, the value of the hops at the time stipulated for their delivery by Johnston to the plaintiffs over and above the price which plaintiffs were to pay therefor, with interest thereon at the rate of 6 per cent per annum from October 31, 1903. From this decree the present appeal was taken by all the defendants. Subsequently, by stipulation, the appeal was dismissed as to Johnston, leaving it in force as to Wolf & Son and the railroad company.                                  AFFIRMED.

For appellants there were oral arguments by *Mr. George Greenwood Bingham* and *Mr. Anderson M. Cannon*, with a brief over the names of *Carson & Cannon, W. D. Fenton* and *G. G. Bingham*, to this effect.

I. Whosoever approaches a court of equity must do so with clean hands; therefore such a court will not extend the extraordinary relief of specific performance to one who has himself trifled or shown a backwardness or whose actions have helped to produce the situation of which he complains.   Such a suitor will be turned away to be satisfied with such remedy as he may have at law: *Kinney* v. *Redden,* 2 Del. Ch. 46; *Benedict* v. *Lynch,* 1 Johns. Ch. 370 (4 Am. Dec. 484); *Stauntenburg* v. *Tompkins,* 9 N. J. Eq. 332; *Conrad* v. *Lindley,* 2 Cal. 173; *Clark* v. *Maurer,* 77 Iowa, 717; *Kirby* v. *Harrison,* 5 Ohio St. 326; *Wormser* v. *Garvey,* 4 Hun, 478; *Guest* v. *Homfray,* 5 Ves. Jr. 818.

II. Interest does not begin to run on unliquidated damages until merged in judgment: B. & C. Comp. § 4595; *Glidden* v. *Street,* 68 Ala. 600; *Buckmaster* v. *Grundy,* 8 Ill. 626; *Randall* v. *Greenwood,* 3 Mont. 506; *Eagan* v. *Missouri Pac. Ry. Co.* 6 Mo. App. 594; *Brady* v. *Wilcoxan,* 44 Cal. 239; *Viatti* v. *Nesbitt,* 22 Nev. 390; *Hartman's Estate,* 35 N. Y. Supp. 495; *Shipman* v. *State,* 44 Wis. 458.

III. An unliquidated demand is one which the parties are themselves unable to render certain: *Roberts* v. *Prior,* 20 Ga. 61; *Harvey* v. *Hamilton,* 155 Ill. 377 (40 N. E. 592).

For respondents there were oral arguments by *Mr. Woodson T. Slater* and *Mr. Wirt Minor,* with a brief over the names of *Teal & Minor, W. T. Slater* and *W. M. Kaiser,* to this effect.

1. Where a contract fixes a day certain on which a thing is to be done, the promissor has until the last minute of the last day to perform his obligation, which had clearly not elapsed in the present instance: *Curtis* v. *Blair,* 26 Miss. 309 (59 Am. Dec. 257); *Catts* v. *King,* 5 Maine, 482, 486; *Purinton* v. *Sidgley,* 54 Maine, 276, 283 (89 Am. Dec. 748); 9 Cyc. 608.

2. One who purchases from a party to a suit the subject matter of the litigation, after the court has acquired jurisdiction, is bound by the result, whether he paid value or not, and without reference to notice either express or implied: *Houston* v. *Timmerman,* 17 Or. 499 (4 L. R. A. 716, 11 Am. St. Rep. 848, 21 Pac. 1037); *Earle* v. *Couch,* 60 Ky. (3 Met.) 450; *Tilton* v. *Cofield,* 93 U. S. 163.

3. When a defendant, during the pendency of a suit for specific performance of a contract, voluntarily so acts that he cannot comply with the contract, a court of equity may retain the suit and award compensation in money instead of performance, on the ground of avoiding a multiplicity of suits; Waterman, Spec. Perf. § 517; *Milkman* v. *Ordway,* 106 Mass. 232; *Greenway* v. *Adams,* 12 Wis. 395; *Woodcock* v. *Bennett,* 1 Cow. 711 (13 Am. Dec. 568) ; *Parkhurst* v. *Van Cortland,* 1 Johns. Ch. 273; *Phillips* v. *Thompson,* 1 Johns. Ch. 131; *Morse* v. *Eldendorf,* 11 Paige Ch. 277; *Wiswall* v. *McGowan,* Hoffman, Ch. 125.

4. The effect in equity of the contract between respondents and Johnston with respect to personal property not in existence at the time, but to be produced, is to make respondents the equitable owner thereof as soon as the property came into existence, and Johnston holds the legal title as trustee for respondents, and whoever buys with notice of such contract holds subject to respondents' rights: Pomeroy, Equity (1 ed.), §§ 365-9, 373, 689, note 5; *Livesley* v. *Johnston,* 45 Or. 30 (76 Pac. 946, 65 L. R. A. 783, 106 Am. St. Rep. 647) ; *Briggs* v. *United States,* 143 U. S. 346; *Willoughby* v. *Lawrence,* 116 Ill. 11 (56 Am. Rep. 758) ; *Kettle River Co.* v. *Eastern Ry. Co.* 41 Minn. 461; Waterman, Spec. Perf. 512; *Hoagland* v. *Williams,* 22 Iowa, 378; *Smoot* v. *Rea,* 19 Md. 398; *Snowman* v. *Harford,* 57 Me. 397.

MR. CHIEF JUSTICE BEAN delivered the opinion.

1. After this appeal had been perfected the appellants moved for an order directing the plaintiffs and respondents to satisfy the decree, on the ground that after the case was argued and submitted to the trial court, and while it was under advisement, the plaintiffs and Johnston voluntarily settled the subject matter of the litigation and canceled the contract upon which the suit is based, which fact was concealed and suppressed by the plaintiffs and their attorneys, and was not known to the defendants or the court below until long after the decree had been rendered. This is an appellate court, constituted and organized to revise and correct the proceedings of the trial court, when

regularly brought before it by appeal, and has no original juris-
diction, except such as may be incident to and in aid of its
appellate powers: *Che Gong* v. *Stearns,* 16 Or. 219 (17 Pac.
871). Its inquiry is ordinarily confined to an examination of
the record of the court below as embodied in the transcript, but
where the appellant has, by some act of his, subsequent to the
rendition of the judgment or decree appealed from, waived the
right of appeal or otherwise terminated the controversy, such fact
may be shown by evidence *dehors* the record, and the appeal will
be dismissed because there is no longer any substantial contro-
versy between the parties: *Ehrman* v. *Astoria Ry. Co.* 26 Or. 377
(38 Pac. 306) ; *Moores* v. *Moores,* 36 Or. 261 (59 Pac. 327).

2. But, where the relief sought is based on newly discovered
evidence, the remedy is not by motion in this court, but by an
original suit to vacate or annul the decree: *Nessley* v. *Ladd,* 30
Or. 564 (48 Pac. 420) ; *Hilts* v. *Ladd,* 35 Or. 237 (58 Pac. 32) ;
*McLeod* v. *Lloyd,* 45 Or. 67 (75 Pac. 702). The facts upon
which the motion in question is based are in the.nature of newly
discovered evidence, and the inquiry presented involves the con-
sideration and decision of controverted questions of fact. The
plaintiffs deny that any settlement of the subject matter of the
litigation was ever made by them with Johnston. This question
cannot be tried out on *ex parte* affidavits in this court, and the
defendants' remedy, if any, must be found in some other proper
proceeding.

The contention for the defendants is that a court of equity
will not decree a specific performance of the contract in suit
because (1) the plaintiffs have acted in bad faith and have been
guilty of such laches and delay as will preclude them from relief
in equity; (2) the defendant Johnston was solvent at the com-
mencement of this suit and able to respond in damages for a
breach of his contract and, therefore, plaintiff had a full and
complete remedy at law; and (3) the court erred in allowing
interest on the value of the hops from November, 1903, the time
defendants deprived themselves of the power of specifically per-
forming the contract by selling and disposing of the hops, and
removing them from the jurisdiction of the court.

3. On the first point the argument is that although Johnston may be bound by his contract and liable in an action at law for damages for a breach thereof, the plaintiffs' conduct has been such that they are in no position to ask the aid of a court of equity to enforce specific performance of the contract against him or the other defendants who purchased the property *pendente lite*. If the plaintiffs have in good faith complied or offered to comply with their part of the contract, and Johnston was in fact insolvent at the time the suit was commenced, their right to a specific performance as against the defendants is settled by the former decision which has become the law of the case: *Livesley* v. *Johnston,* 45 Or. 30 (76 Pac. 13, 946, 65 L. R. A. 783, 106 Am. St. Rep. 647). We are only to inquire, therefore, whether the evidence shows that plaintiffs have in good faith performed or offered to perform the contract on their part, and whether Johnston was in fact insolvent at the time the suit was commenced. By the terms of the contract the plaintiffs were required to advance to Johnston on or about April 1, 1903, the sum of $336, with which to pay the rent on the hopyard occupied by him, $250 "on or about April, May and June," for expenses of cultivating the hops, and, "at and during picking time of September," the sum of $4\frac{1}{2}$ cents a pound for the expenses of picking. In compliance with their contract the plaintiffs did, on March 28, 1903, send to Johnston by mail their check for $336, payable to the owners of the hopyard, and another check for $250, payable to Johnston personally. These checks were sent in a letter to Johnston at Gervais, his post office address, as stated in the contract, but did not reach him until about the 1st of April.

On the 30th and 31st of March, and before the receipt of the letter containing the checks, Johnston started from his home near Gervais to Salem, the place of business of the plaintiffs, to obtain from them the advances as stipulated. While on his way and in the town of Gervais, he met Roberts, with whom he had some conversation, but not about the contract in suit. While traveling from Gervais to Salem on the train Johnston and Roberts had some controversy, which, soon after reaching the

(48th Or.—4)

station, resulted in a personal encounter between them. They differ as to the cause and nature of the difficulty. Roberts says that while on the train Johnston approached him and said he was not going to live up to the hop contract and if the plaintiffs made any advances thereunder he would not use the money for the purposes stipulated and that the plaintiffs would have no recourse as he was insolvent. Johnston testifies that as the train approached Salem he was going through the cars, "having some fun with the boys," and Roberts asked him why he did not quit drinking, and he said he "would not quit for anybody, for he was having too much fun"; that after the train arrived at Salem Roberts again remonstrated with him about drinking and said that if he did not quit the plaintiffs would not advance any money under the hop contract; that he informed Roberts that the plaintiffs were "not the only men on the beach," whereupon Roberts struck him over the head with an umbrella and he returned the blow with his fist; that he returned home without calling at the office of the plaintiffs because he was afraid to do so.

On March 31st, the day of this difficulty, or the following day, the plaintiffs wired the bank at Woodburn, with which Johnston did business, stopping payment on their check for $250 in Johnston's favor and at the same time wrote him that they had stopped payment on the check because in looking over the contract they had ascertained that "the advance was to be made on or about April, May and June," and not on April 1st as they originally supposed, but that they would "advance the money according to contract." On April 1st and before Johnston received this letter he called at the bank at Woodburn to cash the checks previously received by him from the plaintiffs, and was informed by the cashier, as he testifies, that payment of the checks had been stopped. He did not, however, present either of the checks, or request to see the telegram stopping payment on them, but immediately telephoned the defendants Wolf & Son and arranged with them to advance money with which to pay the rent on the hopyard. On the next day he returned the two checks to the plaintiffs and notified them that

he had elected to rescind the contract because of their failure to comply with its terms. He has ever since refused to recognize the plaintiffs' rights under the contract, although they notified him in writing on April 4th, April 16th, August 31st and September 8th, that they were ready and willing to comply with the contract and to make all advances stipulated therein, and did on April 4th offer in writing to pay the sum of $250 for the expenses of cultivation and $336 with which to pay his rent. On April 3d, Johnston borrowed from the defendants Wolf & Son money for rent and on the 10th of the next month contracted his hops to them and thereafter received from them advances from time to time to pay the expenses of cultivating and harvesting the crop, and after the preliminary injunction had been dissolved, sold the hops to them and they were shipped out of the State by the defendant the Southern Pacific Co.

It thus appears that plaintiffs tendered to Johnston the rent money before it became due and were at all times ready and willing to comply with their contract by making the stipulated advances. The only amount due on April 1, 1903, was the rent and a check sent in payment of it on March 28th was received by Johnston. No objection was made because the money was sent in the form of a check, and there is no pretense that payment of such check was stopped by the plaintiffs or that it would not have been paid had it been presented. The advances for cultivation were to be made "on or about April, May and June," and presumably as the same might be needed for the purposes stated. Payment was stopped of the $250 check sent for such purpose because the plaintiffs believed the money was not then due, or because they supposed from Johnston's conduct that he might carry out his threat and misapply it. It was not because the plaintiffs did not intend to comply with their contract. In the letter to Johnston in reference to the matter it was expressly stated that the advances would be made "according to contract." If the plaintiffs were mistaken as to the proper interpretation of the contract and the money was in fact due on the 1st of April, a failure to make the advances on the exact day specified would not justify Johnston in rescinding the con-

tract if the plaintiffs were willing to make such advances as they were needed for cultivating purposes. There was, therefore, no such laches, delay or misconduct of the plaintiffs as will defeat this suit.

Where the party who applies for the specific performance of a contract has been guilty of laches and unreasonable delay, or has not acted in good faith, he will be denied relief: *Creath* v. *Sims,* 46 U. S. 192 (12 L. Ed. 110) ; *Kinney* v. *Redden,* 2 Del. Ch. 46, 54; *Benedict* v. *Lynch,* 1 Johns. Ch. 370 (7 Am. Dec. 484) ; *Conrad* v. *Lindley,* 2 Cal. 173. But this case does not fall within this rule. Much importance is given to the personal difficulty and encounter between Roberts and the defendant Johnston, but in our opinion it has but little, if any, bearing upon the merits of the present controversy. It certainly was no ground for the repudiation of the contract by Johnston, and it does not appear that the plaintiffs refused to perform their part of the contract on that account. There is no evidence that the plaintiffs intended to repudiate the contract because of this difficulty. It may be that on account of Johnston's conduct Roberts gave the terms of the contract a stricter and more technical construction than he otherwise would have done, and stopped payment on the check for advances because it was not then due, but it is clear that he intended to make further advances. If the plaintiffs had designed to repudiate the contract and not to be further bound by it, they most certainly would have stopped payment on the check for rent as well as the one for advances. The only security they had for the payment of either was the hop contract, and the right to deduct the several amounts from the stipulated price of the hops. It may be that Johnston supposed when informed by his banker that payment of the check had been stopped that the plaintiffs intended not to be further bound by their contract. He made no inquiry, however, to ascertain the truth of the matter, but immediately entered into negotiations with his codefendants Wolf & Son for money with which to pay the rent and the expenses of cultivating and harvesting his hop crop, and on the next day attempted to rescind the contract. It is undis-

puted from the testimony that Johnston was mistaken if he entertained the opinion that plaintiffs did not intend to comply with their contract and clearly his mistake did not justify him in repudiating it and is no defense to the relief sought by the plaintiffs in this suit.

4. On the question of Johnston's solvency but little need be said. At the time this suit was commenced he had no property outside of the hop crop of 1903, which is the subject matter of this controversy, and cannot be considered in determining the question of his solvency as it affects the jurisdiction of the court to enforce specific performance of the contract, except a lease of the hopyard for the years 1904, 1905, 1906 and 1907, and a house and 20 acres of land worth, as he testifies, about $1,500. The lease was of an uncertain value and contained a stipulation that it should not be assigned or sublet without the consent of the lessors, and it is doubtful whether it could be seized or sold on execution at all. The other property was probably a homestead and not subject to seizure and sale under execution: B. & C. Comp. § 221. So that it is perfectly clear that an action at law against Johnston for breach of his contract would have been an inadequate remedy.

5. Interest was allowed by the court below, not as such, but as damages. The pleadings and evidence show that the hops were in the possession of the defendants at the time this suit was commenced, but that during its pendency Johnston and the defendants Wolf & Son, who purchased the hops of him, and the Southern Pacific Co. shipped them out of the State so that it is not possible for them now to specifically perform the contract. And where defendants thus deprive themselves of the power, during the pendency of a suit for specific performance, to perform the contract specifically, the court will retain jurisdiction to award the plaintiffs compensation in damages: Waterman, Spec. Perf. § 517; *Milkman* v. *Ordway,* 106 Mass. 232.

6. And the measure of damages in such case is the amount the plaintiff would have been entitled to recover in an action at law for breach of the contract.

7. In this instance such amount is the value of the hops at

the time of the breach, less what the plaintiffs were to pay for them, with legal interest thereon: 1 Sutherland, Damages (3 ed.), § 105.

It follows that the decree of the court below must be affirmed, and it is so ordered.                                    AFFIRMED.