Argued January 25, affirmed April 28, 1950

PITTENGER EQUIPMENT COMPANY,
A CORPORATION, *v.* TIMBER STRUCTURES,
INCORPORATED, A CORPORATION

217 P. (2d) 770

*R. W. Nahstoll,* of Portland, argued the cause for appellant. On the brief were Eben, Jones & Nahstoll, of Portland.

*James K. Buell,* of Portland, argued the cause for respondent. With him on the brief were Griffith, Peck, Phillips & Coughlin, of Portland.

Before Lusk, Chief Justice, Brand, Belt, Rossman and Hay, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a decree of the Circuit Court which ordered the defendant to perform specifically a contract, quoted in the complaint,

and thereby deliver to the plaintiff 125,000 feet of lumber, or, in the event of failure to do so, suffer judgment to be entered against it in the amount of $5,795.15, the value of the lumber.

The defendant-appellant submits two assignments of error. The first is:

"The court erred in overruling the objection of defendant to a trial of the cause as a suit in equity and in proceeding to make its decree ordering delivery by the defendant to the plaintiff of lumber of the quantity and quality prayed for in plaintiff's complaint or in the alternative, and upon failure of such delivery within thirty days from the date of said decree, for recovery by plaintiff from defendant of the sum of $5,795.15 plus interest and costs."

The second assignment of error is:

"The court erred in denying defendant's motion for judgment."

The nature of that contention is stated by the appellant's brief as follows:

"It is the positive duty of the plaintiff to select the proper forum in which to proceed."

Going on, the brief says that the plaintiff's cause was legal, not equitable, and should have been instituted on the law side of the court. Thus, basically, both assignments of error present the same contention; that is, that the court erred when it granted specific performance of the contract.

Section 9-113, O. C. L. A., says:

"The objection to the jurisdiction of the court, or that the complaint does not state facts sufficient to constitute a cause of suit, if not taken by demurrer or answer, may be made on the trial."

The challenge to the court as one of equity jurisdiction did not come until one of the witnesses had given his testimony. We shall now summarize the evidence.

The suit out of which the attacked decree arose was based upon transactions in which one person and three corporations participated. They were the plaintiff, Pittenger Equipment Company, a dealer in logging and sawmill machinery; the defendant, Timber Structure, Inc., a fabricator of timber structures; one Vern Thomas, who, until April 22, 1947, owned and operated a small sawmill; and Vern Thomas Lumber Company, a corporation, which, on April 22, 1947, acquired the properties, succeeded to the business and assumed the indebtedness of Vern Thomas.

The Thomas sawmill was located in the State of Washington at a point some miles distant from Portland. Mr. Thomas had purchased machinery from the plaintiff and, on April 22, 1947, was indebted to it in the sum of $5,795.15, that being the amount stated in the alternative judgment awarded by the decree. No one questions the accuracy of the figure $5,795.15. Thomas sold virtually the entire output of his mill to the defendant, which uses lumber in the conduct of its business. His source of logs was from timberland owned by the defendant. He and the defendant had still another business relationship: he lacked sufficient capital for the conduct of his business, and the defendant from time to time advanced to him sizeable sums of money.

In the spring of 1947, that being the time which is material in this suit, Thomas was beset with critical financial problems. His mill and related properties were encumbered with a defaulted first mortgage held by a bank, which secured an indebtedness of $34,000,

and by a second mortgage, which secured an indebtedness of $30,000 owing the defendant. Thomas had some logging trucks which, if we are not mistaken, were subject to a purchase money lien. In addition, he owed $22,000 or more to unsecured creditors. The largest of the latter was the defendant, and the second largest was the plaintiff.

Although the evidence is not in full accord, it indicates that Thomas' mill and its related equipment were scarcely worth the total of his indebtedness. Some testimony, which possibly may represent the truth, suggests that the debts were greater than the value of all assets. Plainly, no one could be certain as to the value of the assets unless he prepared an inventory and, after offering all properties for sale, obtained offers. The record shows without peradventure of doubt that upon forced sale the properties would have yielded materially less than the total indebtedness. The fact that many of the creditors accepted in satisfaction of their accounts, as we shall presently see, only 30 per cent of the total due may throw more light than any other phase of the evidence upon the issue of Thomas' solvency and his prospects for the future.

The condition of Thomas' finances had become so disturbing to his creditors by March of 1947 that some of them were manifesting impatience. The bank threatened foreclosure of its mortgage, and the plaintiff became insistent upon payment of its account. The defendant, which evidently felt that time would enable Thomas to discharge all of his debts, nevertheless was uneasy lest one of the small creditors would attempt to have Thomas adjudged a bankrupt. Some of the other creditors actually met for the purpose of considering a plan of action. The record seems to war-

rant a belief that Thomas' condition was not hopeless, if his creditors would display forbearance.

In March, 1947, the defendant advanced Thomas $8,000 to enable him to resume operations after his mill had been shut down for a period. It was thought that further advances would be needed, and the defendant, being fearful, as we have said, that a creditor might attempt to have Thomas adjudged a bankrupt, wished to improve his financial condition. Incidental thereto, the defendant believed that Thomas ought to incorporate his business and render control of the business available to the defendant if it wished to exercise control. Yielding to the defendant's views, Thomas incorporated his business, had two of the defendant's nominees elected to the board of directors consisting of three persons, and deposited all of the stock of the corporation with trustees suggested by the defendant. The corporation assumed all of Thomas' indebtedness and, of course, acquired his sawmill properties. The purpose of the trust is thus expressed by the trust instrument:

> "That for the purpose of perfecting such arrangement and of securing such voting rights to Timber Structures, Inc., or its nominees, the Stockholders hereby assign, transfer and set over unto the Trustees 100 shares of NPV stock, being all of the capital stock of Vern Thomas Lumber Co., in trust, until all unsecured creditors of Vern Thomas, and of said corporation, Vern Thomas Lumber Co., and all future unsecured advances to said corporation by any of said creditors, or by others, are fully paid, provided, however, that in no event shall this Trust continue for a period of more than ten years."

The two directors whom the defendant nominated were W. J. Van Arnam, comptroller of the defendant,

and Arthur D. Jones, a member of the firm of attorneys who were the defendant's counsel. The two trustees were D. F. Kinder, vice-president of the defendant, and John Schneider, an employee of the defendant.

Shortly after the formation of the corporation, the defendant induced virtually all of the unsecured creditors of Thomas and of the corporation, Vern Thomas Lumber Company, to sign an agreement, which declared:

> "Whereas, the debtors have agreed to transfer and assign all of their properties and assets in any way associated with their sawmilling and logging operations, including claims and accounts receivable, unto Timber Structures, Inc. and to pay in addition thereto unto said Timber Structures, Inc. a sum equal to 15% of their unsecured indebtedness exclusive of any indebtedness owing said Timber Structures, Inc. and have further agreed to obtain enforceable agreements with all of their unsecured creditors, except said Timber Structures, Inc., to accept in full settlement of their respective claims a sum equal to 30% thereof; and
>
> "Whereas, Timber Structures, Inc. has agreed that, upon performance of said agreements by the said debtors within a period of 30 days from the date hereof, it will pay unto the said unsecured creditors a sum equal to 30% of their unsecured claims against said debtors and will, in addition thereto, discharge and release the debtors from liability on any and all secured and unsecured claims by it held against the said debtors."

That agreement was signed by the defendant, by Thomas and by the newly formed corporation, Vern Thomas Lumber Company, in addition to virtually all creditors, with the exception of the plaintiff.

Concurrently with the above agreements, Thomas and his newly formed corporation agreed that they

would purchase nothing without first securing the defendant's written approval. An official of the defendant visited the mill twice weekly.

The plaintiff refused to sign the agreement which bound the unsecured creditors to accept in satisfaction of their accounts 30 per cent of the amount owing. About the same time the bank began foreclosure of its mortgage. The peril to Thomas' prospects of saving himself from financial destruction was thwarted by the defendant when it induced one of Thomas' creditors to purchase the mortgage after it (the defendant) had guaranteed its payment. In the meantime, the plaintiff and the defendant came to an agreement whereby the plaintiff bound itself to accept in payment of its account 125,000 feet of lumber produced by the Thomas mill. Thomas was not consulted concerning the agreement, but neither he nor his corporation challenges its validity or wisdom. In order to evidence their agreement, the plaintiff wrote to the defendant a letter which recited the terms of the agreement, and Mr. Van Arnam, acting upon the defendant's behalf, signed his approving signature to it. The letter reads as follows:

"April 22, 1947

Timber Structures, Incorporated
North West 29 and Yeon Avenue
Portland, Oregon

Attention: Mr. Van Arnam

Gentlemen:

In confirmation of our telephone conversation yesterday, you can consider this a firm order for 125,000 feet of rough lumber from the Vern Thomas, Incorporated, Lumber Mill under the following specifications:

The thickness shall be 2", 3", and 4". It shall be from 4" wide up to 12" wide and from 10' to 24'

in length. It shall be #2 Common and Better, not to exceed 20% #2.

This lumber will be delivered to Eastern and Western dock at the rate of 25,000 feet per week until the 125,000 feet have been delivered, commencing the week of April 28.

The mode of payment for the above order will be that we will credit Vern Thomas' account as we receive the lumber and will have enough lumber in this order entirely to clean up his back balance.

The price of this lumber will be $53 per thousand delivered, and there will be around $1000 overage, which we will pay to your concern at the completion of this order.

We will require three days' notice before shipment for inspection, and we will stand the cost of inspection at the mill. It is understood that there will be at least 25,000 feet ready for inspection at any time before the lumber is put on the jacks.

We understood from Mr. Thompson that if we would furnish the paint and brushes, your regular grader would put the different colored daubs on the ends of the pieces as instructed by the association inspector.

We will still expect Vern Thomas to buy all of his logging equipment from us, providing that the price of our merchandise is the market price in the City of Portland, Oregon. This applies only to merchandise which we can supply, and not to cat or saw mill equipment.

Yours very truly,

Pittenger Equipment Company
W. H. Feigenson.

WHF:hem

Accepted:

(Signed) W. J. Van Arnam''

It is agreed that the name Vern Thomas, Incorporated, Lumber Mill, appearing in the agreement, was inadvertently used in lieu of the correct name, Vern Thomas Lumber Company.

The essence of the agreement was this: The defendant would ship to the plaintiff 125,000 feet of lumber produced by the Thomas mill, and the plaintiff would credit its account against Thomas with the value of the lumber upon the basis of $53.00 per thousand feet. It was assumed, as is seen from the terms of the quoted agreement, that the lumber would be worth about $1,000 more than the sum owing, and the plaintiff agreed to pay that sum to the defendant.

The agreement, if performed, would have benefited all parties. The plaintiff would have received lumber in satisfaction of its account, and, since it had a buyer for the lumber, performance of the contract would have taken care of an account which was of problematical value. The defendant would have benefited multifold by performance of the agreement. Satisfaction of the plaintiff's account would have rid the mill of the creditor which most jeopardized its continued operation. Operation was essential to the defendant for three reasons: the mill was an important source of the defendant's lumber; continued operation might enable Thomas eventually to defray his debts, including those owing the defendant; and, finally, the Thomas mill, if operating, would continue to procure its logs from timberland owned by the defendant.

The lumber mentioned in the agreement was not delivered to the plaintiff, and after the default this suit was filed. No contention was made at the trial that the description of the lumber contained in the agreement was incomplete, indefinite or uncertain. Nor has any

assertion been advanced that specific performance of the agreement was impractical. As we have seen, the defendant's sole contention is that for the violation of the agreement the plaintiff has an adequate remedy at law through an action for damages, and that, therefore, equity has no jurisdiction over this cause. Even though the appellant does not claim that the lumber, which is the subject matter of the suit, is not specific, the following facts, uncontradicted and unchallenged, show that it is. The Thomas mill operated from April to August, 1947. In April and May it shipped to the defendant the following invoices of lumber: 132,444 board feet, 109,221 board feet, 114,421 board feet, 98,-811 board feet, 128,156 board feet and 149,920 board feet. Other shipments went from the mill to the defendant in the succeeding months. Mr. Thomas was asked concerning all of the above:

"I'll ask you whether or not there was included in there sufficient lumber of the sizes and grades as is indicated in this letter of April 22, 1947, to have filled this requirement here of 125,000 feet." He answered "yes." The foregoing is a sufficient narrative of the pertinent facts.

The parties appear to assume that the section of our laws which is most material to the assignments of error is § 9-101, O. C. L. A., reading as follows:

"The enforcement or protection of a private right, or the prevention of or redress for an injury thereto, shall be obtained by a suit in equity in all cases where there is not a plain, adequate and complete remedy at law, and may be obtained thereby in all cases where courts of equity have been used to exercise concurrent jurisdiction with courts of law, unless otherwise specially provided in this title. * * *"

We observe that § 71-168, O. C. L. A., being § 68 of the Uniform Sales Act, says:

"Where the seller has broken a contract to deliver specific or ascertained goods, a court having the powers of a court of equity may, if it thinks fit, on the application of the buyer, by its judgment or decree direct that the contract shall be performed specifically, without giving the seller the option of retaining the goods on payment of damages. The judgment or decree may be unconditional, or upon such terms and conditions as to damages, payment of the price and otherwise, as to the court may seem just."

We are aware of no reason for believing that the agreement, previously quoted, which the plaintiff and the defendant made April 22, 1947, is not within the purview of that section of our laws. The defendant, after obtaining complete control over the Thomas mill and the corporation which owned it, contracted, as we have seen, to deliver to the plaintiff "125,000 feet of rough lumber from the Vern Thomas" mill. We have also seen that in the period beginning two weeks before the date of the contract and continuing on through several months following the formation of the contract, the defendant received from the Thomas mill quantities of lumber of the kind specified in the contract far in excess of that which was needed to fill the contract. The lumber described in the sales contract constituted specific and ascertained goods: *Logan v. Cross,* 101 Or. 85, 198 P. 1097; see, also, *Livesley v. Johnston,* 48 Or. 40, 84 P. 1044. The plaintiff, as has been observed, did not agree to part with any money in payment for the lumber, but undertook as its quid pro quo to satisfy an account which it held against Thomas. The account was of problematical monetary value, but

of considerable nuisance value. Until Mr. Van Arnam, acting on behalf of the defendant, had signed the contract, the defendant had been in no way responsible for Thomas' debt. The contract of April 22, however, rendered the defendant responsible for the debt to the extent of selling and delivering to the plaintiff 125,000 feet of lumber in its satisfaction. The agreement was in the nature of an accord or compromise. Equity has a tender regard for such jural relationships.

By virtue of § 71-168, O. C. L. A., just quoted, the sales agreement under consideration is enforceable specifically "by a court of equity if it thinks fit." The import of the last four words is the problem which now confronts us.

Section 601, Williston on Sales, Rev. ed., after quoting § 68 of the Uniform Sales Act (§ 71-168, O. C. L. A.,) says:

"This section follows Section 52 of the English Sale of Goods Act. Some changes in wording, however, have been made. The English section begins with the following words: 'In an action for breach of contract to deliver specific or ascertained goods, the court may, if it thinks fit, on the application of the plaintiff,' and, thereafter proceeds as in the American act. At the end of the English section the following words, which have been dropped from the American act, have been added: 'And the application by the plaintiff may be made at any time before judgment or decree.' Courts of equity have very closely restricted their jurisdiction in regard to contracts for the sale of personal property. It would sometimes promote justice if the courts were somewhat more ready to allow specific performance of contracts to sell goods in cases where for any reason damages did not seem adequate. This section of the act will perhaps dispose courts to enlarge somewhat the number of cases where specific per-

formance is allowed. It has been asserted that the section does not change the law. The English Court has held, however, that the corresponding section in the Sale of Goods Act gives the court full discretion to enforce for the buyer a contract for the sale of specific goods, and where the Sales Act has been enacted, it seems probable that American courts will be more ready to exercise their discretion in favor of the remedy. It is worth noting that on the Continent of Europe and in Scotland specific performance is allowed without any other limitations than those which the circumstances of the case necessarily impose.''

We take the following from Williston on Contracts, Rev. ed., § 1419:

''* * * Contracts for the sale of personal property, on the other hand, are not generally enforced specifically, and a clear case of the inadequacy of damages is necessary in order to obtain equitable relief. Such a case is established, where a chattel which is the subject of the contract is unique, or not purchasable in the market. The modern disposition is to be less technical in the application of this principle, and * * *. Probably the future tendency of the courts will be towards a freer allowance of the remedy in the case of contracts to sell personalty than might be inferred from the earlier precedents.''

We now quote from Restatement of the Law, Contracts, § 358:

''(1) A decree for the specific performance of a contract, either in the form of an affirmative or of a negative order, will be granted against a party who has committed a breach, or is threatening one, if the remedy in damages would not be adequate and the requirements of the rules stated in §§ 359-380 are satisfied.

"(2) The existence of a remedy other than money damages for breach of contract is not in itself a sufficient reason for refusing specific enforcement; but it may properly be considered along with other facts in exercising the judicial discretion that exists as stated in § 359."

Comment (d) following the above says:

"There has been a progressive tendency in the United States to increase the number of cases in which money damages are not regarded as an adequate remedy, with a resulting greater liberality in granting decrees for specific performance. For a statutory provision enacting a liberal rule for specific enforcement against a seller of goods, see § 68 of the Uniform Sales Act."

Section 361 of the Restatement gives the following tests for determining the adequacy of damages:

"In determining the adequacy of the remedy in damages, as to contracts other than for the transfer of an interest in land, the following factors are influential and may singly or in combination justify specific performance:

(a) the degree of difficulty and uncertainty in making an accurate valuation of the subject matter involved, in determining the effect of a breach, and in estimating the plaintiff's harm;

\* \* \*

(e) \* \* \*."

Good reason warrants liberalization of the rule of specific performance. Story's Equity Jurisprudence, 14th ed., § 994, states it in these words:

"The truth is, that upon the principles of natural justice Courts of Equity might proceed much farther and might insist upon decreeing a specific performance of all bona fide contracts, since that is a

remedy to which Courts of Law are inadequate. There is no pretence for the complaints sometimes made by the common lawyers, that such relief in equity would wholly subvert the remedies by actions of the case and actions of covenant; for it is against conscience that a party should have a right of election whether he would perform his covenant or only pay damages for the breach of it. But on the other hand there is no reasonable objection to allowing the other party who is injured by the breach to have an election either to take damages at law or to have a specific performance in equity, * * * ."

Thus we see the great Story, a century ago, favored liberalization of equity's rule of specific performance of covenants concerning personal property. In our generation Professor Samuel Williston took up the cause, and the effect of his work is reflected in the many places of which we have taken notice. Others are urging the courts to grant more frequently specific performance of contracts concerning personal property. See 9 Duke Bar Assn. J. 122, 2 Ark. Law Rev. 461, and Wis. Law Rev. 1946, p. 461. A comprehensive annotation in 152 A. L. R. 4 deals with the subject, and at page 44 concerns itself with statutes such as § 68 of the Uniform Sales Act. The citations in the annotation, which itself is quite recent, are brought up to date in 1949—Sixth Issue, A. L. R. Blue Book, p. 370. The treatises which we have mentioned cite all of the pertinent decisions of which we have knowledge. Since we have given the source, we shall not collate the authorities in this opinion, except to call attention to the following which display a liberal attitude: *Oreland Equipment Co. v. Copco Steel and Engineering Corp.*, 1944, 310 Mich. 6, 16 N. W. 2d 646; *Kann v. Wausau Abrasives Co.*, 1925, 81 N. H. 535, 129 A. 374; *Mantell v. International Plastic Harmonica Corp.*, 1946, 138

N. J. Eq. 562, 49 A. 2d 290; *Demoss v. Conart Motor Sales, Inc.,* Ohio Com. Pl., 1947, 72 N. E. 2d 158, noted in 26 Tex. L. Rev. 351 (1948); *Cochrane v. Szpakowski,* 1946, 355 Pa. 357, 49 A. 2d 692; *Campbell Soup Co. v. Wentz,* 172 Fed. 2d 80; see the criticism of *Outten Grain Co. v. Grace,* 239 Ill. App. 284, in 25 Mich. L. Rev. 558. *Livesley v. Johnston,* 48 Or. 40, 84 P. 1044, is cited by Williston on Contracts, Rev. ed., § 1419, as in accord with the liberal tendency. We think that the citation is merited.

In our opinion, § 68 of the Uniform Sales Act (§ 71-168, O. C. L. A.) entitled the plaintiff to the decree of specific performance which was awarded to it, if an award of damages by a law court would not be as perfect and complete a remedy.

*Gottschalk v. Stein,* 69 Md. 51, 13 Atl. 625, contains reasoning which has bearing upon the issues before us. The facts in that case, succinctly stated, were: Weiller & Son, a partnership, became insolvent and made an assignment for the benefit of its creditors to one Leopold, a plaintiff in the case. Shortly after the assignment, the creditors entered into an agreement with one Stein, the other plaintiff, whereby Stein endorsed settlement notes which were given to the creditors and which the partners had signed. The agreement bound Leopold to surrender possession of the firm assets to Stein by way of security after Stein had endorsed the notes. After those acts had been performed and Leopold had surrendered possession, Gottschalk, defendant in the suit, presented for payment three notes signed by the partnership aggregating $7,500. They had been omitted from the settlement. After some negotiations, Gottschalk agreed to sell the notes to Leopold and Stein for $3,000. Stein wished the notes

on account of the fact that he was related to the members of the partnership and wanted to protect their interests. Leopold and Stein sued Gottschalk for specific performance of the contract of sale. In sustaining the decision of the lower court, which granted specific performance, the court on appeal said:

"* * * But we take it to be well settled that where there is an agreement to buy a specific chattel for a specific purpose, and this purpose can only be answered by the delivery of the chattel itself, or where, from the nature of the subject-matter of the agreement, the measure of damages must necessarily be uncertain; or where damages will not be as beneficial to the purchaser as the performance of the contract, equity will interfere and decree the specific performance of the contract, because, in such cases, an action at law for a breach of the contract will not afford the purchaser a complete and adequate remedy. In the language of Lord Selborne, 'the principal which is material to be considered is that the court gives specific performance instead of damages only when it can by that means do more perfect and complete justice.' (Wilson v. Railway Co., 9 Ch. App. 279,) or, in other words, where damages at law fall short of that redress to which one is fairly and justly entitled. Doloret v. Rothschild, 1 Sim. & S. 590; Buxton v. Lister, 3 Atk. 385; White v. Schuyler, 1 Abb. Pr. (N.S.) 300; Ashton v. Corrigan, L. R. 13 Eq. 76; Robinson v. Cathcart, 2 Cranch, C. C. 490; Cutting v. Dana, 25 N. J. Eq. 265."

Going on, the decision said:

"Now, in this case, the appellant agreed to sell to the appellees the three promissory notes of Weiler & Son, and the appellees agreed to buy these notes for a specific purpose, which was known to the appellant. An action at law for a breach of the contract would not, it is clear, give to the appellees

the subject-matter of the contract. And besides, the damages to be recovered must necessarily be uncertain. The face value of the notes is $7,500, and the appellant agreed to sell and transfer them to the appellees upon the payment of $3,000. If the firm of Weiller & Son was perfectly solvent, there would be no difficulty in determining the measure of damages. But the firm, the record shows, was insolvent, the assets being insufficient to pay their debts. And in an action at law the measure of damages would depend upon the personal ability of the members of the firm to pay the amount due on the notes; and, this being uncertain, the damages to be recovered must also be uncertain. The legal remedy under such circumstances would fall short of that redress to which the appellees are justly entitled, and is not, therefore, as beneficial to them as the specific performance of the contract. There is no distinction, it seems to us, between this case and Wright v. Bell, 5 Price, 325. There the assignee in bankruptcy agreed to sell a debt of 550 lbs. due the bankrupt for 500 lbs. The defendant having refused to pay the 500 lbs., a bill was filed for the specific performance of the contract, and it was argued that the remedy of the plaintiff was by an action at law for a breach of the contract. But the lord chief baron held that, although equity would not, as a general rule, enforce the performance of contracts for the sale of chattels, yet a contract to sell a specific debt was an exception to the rule. And then again, in Adderley v. Dixon, 1 Sim. & S. 607, where the plaintiff, being entitled to a dividend in two bankrupt estates, agreed to sell the claim for 2s. and 6d. in the pound, Sir John Leach, vice-chancellor, said: 'Courts of equity decree the specific performance of contracts, not upon any distinction between realty and personalty, but because damages at law may not in the particular case afford a complete remedy. The present case being for the sale of uncertain dividends which may become payable from the estate of the two bankrupts,

it appears to me that upon the principle established by the cases of Ball v. Coggs, [1 Brown, Parl. Cas. 140,] and Taylor v. Neville, [cited in 3 Atk. 384,] a court of equity will decree specific performance, because damages at law cannot accurately represent the value of the future dividends; and to compel the purchaser to take such damages would be to compel him to sell the dividends at a conjectural price.' So in this case, the damages at law being uncertain on account of the failure of Weiller & Son, the appellees are entitled to the specific performance of the contract. *  *  *''

In that case, it will be observed that Stein and Leopold had agreed to pay Gottschalk $3,000 for the notes which he held and which bore the signature of the insolvent partnership. Damages, so the court ruled, would have been an inadequate remedy for two reasons: (1) if Stein and Leopold got damages, and not specific performance, Gottschalk would still possess the partnership notes and could harass the partnership with them; (2) since the partnership was insolvent, it would be difficult to determine the amount of damages to which Stein and Leopold were entitled.

■ In the case before us the plaintiff, before signing the sales contract of April 22, 1947, held an obligation of Thomas, an insolvent, with which it could have defeated the defendant's plan to rehabilitate him financially. Apart from its problematical monetary value, the account, as we have said, had nuisance value.' At least one of the defendant's purposes in signing the sales agreement was to deprive the defendant of the account. In the Gottschalk case, Stein and Leopold contracted to purchase the notes of the insolvent which Gottschalk held. In the instant case, the defendant did not contract to purchase the account but to satisfy it. The ultimate purpose in the two cases was the same;

that is, to satisfy a creditor of an insolvent. Under the terms of the agreement in the instant case, the plaintiff became entitled to 125,000 feet of lumber, having a value not less than the face value of the account, without being required to do anything more than credit a dubious account with the value of lumber shipped to it pursuant to the terms of the agreement. The task of determining the value of the plaintiff's account against Thomas would have been no less difficult than that of determining the value of the three partnership notes held by Gottschalk in the case just reviewed. The account, like the notes, was the obligation of an insolvent.

Had the plaintiff sued for damages instead of specific performance, it would have been entitled to judgment in an amount representing the value of the lumber less the value of its account against Thomas: *Livesley v. Johnston,* 48 Or. 40, 84 P. 1044. In such an event, it would still retain its account against Thomas and with it could have harassed the very enterprise which the defendant desired to protect. As in the Gottschalk case, the only perfect and complete remedy was specific performance.

■ We revert to the words taken from the Gottschalk decision in our opening quotation from it, which say:

> "Where there is an agreement to buy a specific chattel for a specific purpose, and this purpose can only be answered by the delivery of the chattel itself, or where, from the nature of the subject matter of the agreement, the measure of damages must necessarily be uncertain; or where damages will not be as beneficial to the purchaser as the performance of the contract, equity will interfere and decree the specific performance of the contract."

Obviously, the plaintiff agreed to purchase the lumber "for a specific purpose," and it is plain that "this purpose can only be answered by the delivery of the" lumber itself. The plaintiff is not a dealer in lumber, and agreed to accept the latter for the specific purpose of obtaining satisfaction of its account. If specific performance of the contract must be denied, "the measure of damages must necessarily be uncertain" and "not be as beneficial to the purchaser as the performance of the contract." We base the latter statements upon this fact: it is impossible to ascertain the value of the plaintiff's account against Thomas, and, accordingly, if the plaintiff is relegated to damages, it will be forced to content itself with an amount purely conjectural. It will receive either too much or too little. If it receives the lumber, it will get exactly what the parties intended it should have.

■ Although, as noted in Williston on Sales, Rev. ed., § 601, some courts hold that § 68 of the Uniform Sales Act (§ 71-168, O. C. L. A.) does not change the law pertaining to remedy for breach of contract, we do not concur in that interpretation of the section. We think that if the section was intended to do no more than codify the existing law, it would have employed the current equity terms, such as "unique goods" or "goods unavailable in the market." But it did not embrace those words; it selected new ones which previously had not been used to specify the kind of goods which equity would direct a seller to deliver to the buyer. And, accordingly, we find in the act "specific or ascertained goods." Goods that are "specific or ascertained" may in an occasional instance be unique, but they may also be readily available in the market. Generally, the purpose of substituting new phrases for

existing ones is to substitute new ideas for the old ones. We are satisfied that the purpose of § 68 of the Uniform Sales Act (§ 71-168, O. C. L. A.) was to enlarge the power of courts to grant specific performance of contracts involving the sale of personal property. We do not believe that the purpose was to substitute specific performance as the general remedy for breach of such contracts, but to render it available in instances like the present where an action for damages would be a manifestly deficient remedy.

We have not discussed the law of the State of Washington because the parties have not done so. The case has been submitted upon the evident belief that it is controlled by the law of this jurisdiction. However, Washington has adopted the Uniform Sales Act: 7 Remington's Revised Statutes of Washington, §§ 5836-1 to 5836-70. Section 68 of the Sales Act is § 5836-68 of the compilation just cited. We know of no Washington decision which has construed or applied § 5836-68, but *Welts v. Paddock,* 139 Wash. 668, 247 P. 953, which was decided after the state had adopted the Sales Act, recognized that specific performance was available to the purchaser of a secondhand automobile. The decision did not cite the act.

From the foregoing, it necessarily follows that, in our belief, the decree of the Circuit Court should be affirmed.