## McALLISTER v. COMMISSIONER OF INTERNAL REVENUE.
### No. 266, Docket 20178.

Circuit Court of Appeals, Second Circuit.
Aug. 6, 1946.

FRANK, Circuit Judge, dissenting.

Charles B. Collins, of Jersey City, N. J. (James D. Carpenter, Jr., of Jersey City, N. J., and William Diebold, of New York City, on the brief), for petitioner.

L. W. Post, Sp. Asst. to the Atty. Gen. (Sewall Key, Acting Asst. Atty. Gen., and Helen R. Carloss, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This petition for review presents the question whether the sum of $55,000 received by petitioner on "transfer" or "surrender" of her life interest in a trust to the remainderman constitutes gross income under I.R.C. § 22(a), 26 U.S.C.A. Int.Rev. Code, § 22(a), or receipts from the sale of capital assets as defined in I.R.C. § 117(a)(1), 26 U.S.C.A. Int.Rev.Code, § 117(a)(1). As we shall see, some significance seemingly is attached to a choice between the two words set in quotation marks as a description of the transaction. Petitioner contends that the life estate was a capital asset, the transfer of which resulted in a deductible capital loss, leaving her with no taxable income for the year. A majority of the Tax Court agreed with the Commissioner that the receipt in question was merely an advance payment of income, while four judges dissented, Judges Opper and Disney writing the opposing opinions. 5 T.C. 714.

The will of Richard McAllister established a trust fund of $100,000, the income of which was to be paid to his son John McAllister for life and, on the latter's death without children, to John's wife, the petitioner herein. On her death, the trust was to terminate, the residue going to the testator's wife and his son Richard. The testator died in 1926, his widow in 1935, and John in 1937. Except for stock in the R. McAllister corporation, not immediately salable at a fair price, John left assets insufficient to meet his debts; and in order to obtain immediate funds and to terminate extended family litigation according to an agreed plan, petitioner brought suit in the Court of Chancery of New Jersey to end the trust. The parties then agreed upon, and the court in its final decree ordered, a settlement by which the remainderman Richard, in addition to taking over the stock for $50,000, was to pay petitioner $55,000, with accumulated income and interest to the date of payment, in consideration of her release of all interest in the trust and consent to its termination and cancellation. Receiving payment on July 19, 1940, petitioner, in accordance with the court order, executed a release, providing: "I do further consent and agree that my estate in the aforesaid trust, created under the third paragraph of the * * * will * * * shall be and the same is hereby terminated absolutely, and I do decline to accept further any benefits therefrom or interest therein." For the year 1940, she reported a capital loss on the transaction of $8,790.20, the difference between the amount received and the value of the estate computed under I. T. 2076. The Commissioner disallowed the loss and made the deficiency assessment which was upheld by the majority below.

The issue, as stated by the Tax Court and presented by the parties, reduces itself to the question whether the case is within the rule of Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, or that of Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168. In the Blair case, the life beneficiary of a trust assigned to his children specified sums to be paid each year for the duration of the estate. The Supreme Court held that each transfer was the assignment of a property right in the trust and that, since the tax liability attached to ownership of the property, the assignee, and not the assignor, was liable for the income taxes in the years in question. The continued authority of the case was recognized in Helvering v. Horst, 311 U.S. 112, 118, 119, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655, although a majority of the Court thought it not applicable on the facts, and in Harrison v. Schaffner, 312 U.S. 579, 582, 61 S.Ct. 759, 85 L.Ed. 1055, where the Court very properly distinguished it from the situation where an assignor transferred a portion of his income for a single year. We think that its reasoning and conclusion support the taxpayer's position here. It has been relied upon by other cases cited below which we find indistinguishable from the present case.

Petitioner's right to income for life from the trust estate was a right in the estate itself. Had she held a fee interest, the assignment would unquestionably have been regarded as the transfer of a capital asset; we see no reason why a different result should follow the transfer of the lesser, but still substantial, life interest. As the Court pointed out in the Blair case, the life tenant was entitled to enforce the trust, to enjoin a breach of trust, and to obtain redress in case of breach. The proceedings in the state chancery court completely divested her of these rights and of any possible control over the property. The case is therefore distinguishable from that of Hort v. Commissioner of Internal Revenue, supra, where a landlord for a consideration cancelled a lease for a term of years, having still some nine years to run. There the taxpayer surrendered his contractual right to the future yearly payments in return for an immediate payment of a lump sum. The statute expressly taxed income derived from rent, Revenue Act of 1932, § 22(a), 26 U.S.C.A. Int.Rev.Acts, page 487; and the consideration received was held a substitute for the rent as it fell due. It was therefore taxed as income.

What we regard as the precise question here presented has been determined in the taxpayer's favor on the authority of the Blair case by the Eighth Circuit in Bell's Estate v. Commissioner of Internal Revenue, 8 Cir., 137 F.2d 454, reversing 46 B.T.A. 484. This case, in turn, has been followed by the Tax Court in Harman v. Commissioner of Internal Revenue, 4 T.C. 335, acquiesced in by the Commissioner, 1945-6 Int.Rev.Bull. No. 6, p. 1, and by the District Court in First Nat. Bank & Trust Co. in Macon v. Allen, D.C.M.D.Ga., 65 F.Supp. 128. See also Quigley v. Commissioner of Internal Revenue, 7 Cir., 143 F.2d 27; Estate of Camden v. Commissioner of Internal Revenue, 47 B.T.A. 926, affirmed 6 Cir., 139 F.2d 697; Randall v. Randall, D.C.S.D.Fla., 60 F.Supp. 308, 313, 314.

The Tax Court and the government have attempted to distinguish both the Bell and the Blair cases on grounds which seem to us to lack either substance or reality. The principal ground seems to be the form the transaction assumed between the parties. Thus the Court says that petitioner received the payment for "surrendering" her rights to income payments, and "she did not assign her interest in the trust, as did petitioners in the Bell case." But what is this more than a distinction in words? Both were cases where at the conclusion of the transaction the remaindermen had the entire estate and the life tenants had a substantial sum of money. There surely cannot be that efficacy in lawyers' jargon that termination or cancellation or surrender carries some peculiar significance vastly penalizing laymen whose counsel have chanced to use them. And the fact that the whole affair was embodied in a court decree can add nothing more than a seal of legal validity to it. What was practically accomplished remained the same. And that here, as in the Bell case, there was a "surrender" to the remainderman, rather than

a "transfer" to third persons as in the Blair case, does not change the essentially dispositive nature of the transaction so far as the former property owner is concerned.

Other suggestions seem equally dubious. Thus it is said that the transfer in the Blair case was without consideration. But it is hard to see how this affects either the fact or the validity of the transfer; if anything, the odds should favor the conveyance for a consideration—the income of which will yield taxes in the future. Naturally, since there were no capital gains or losses, the Blair case does not discuss them. (Actually it cites neither the gross income nor the capital assets statutes.) But its holding that the assignment leaves no taxable income with the assignor is just as potent here on the like point, even though we do have the further problem posited by the claim of a capital loss. And there was very definitely a consideration paid in the Bell case. Next it is urged that there could be no assignment because this was a spendthrift trust where the creator had forbidden assignment or anticipation by a beneficiary. (The form of prohibition here was an express command as to a vested equitable interest; there was no grant of discretionary power to the trustees to withhold income.) But the answer is that it was done by a series of transactions affirmed by the state court. That is, the trust provisions made passing of the interest somewhat more difficult, but not beyond the ingenuity of lawyers, when the parties were agreed. So in the Blair case, the government argued that the trust was a spendthrift trust under Illinois law. Said the Court, 300 U.S. 5, 10, 57 S.Ct. 330, 332, 81 L.Ed. 465: "The point of the argument is that, the trust being of that character, the state law barred the voluntary alienation by the beneficiary of his interest. The state court held precisely the contrary. The ruling also determines the validity of the assignment by the beneficiary of parts of his interest. That question was necessarily presented and expressly decided."

Setting the bounds to the area of tax incidence involves the drawing of lines which may often be of an arbitrary nature. But they should not be more unreal than the circumstances necessitate. Here the line of demarcation between the Blair and the Hort principles is obviously one of some difficulty to define explicitly or to establish in borderline cases. Doubtless all would agree that there is some distinction between selling a life estate in property and anticipating income for a few years in advance. It is the kind of distinction stressed in Harrison v. Schaffner, supra, 312 U.S. 579, 583, 61 S.Ct. 759, 762, 85 L.Ed. 1055, where the Court said: "Nor are we troubled by the logical difficulties of drawing the line between a gift of an equitable interest in property for life effected by a gift for life of a share of the income of the trust and the gift of the income or a part of it for the period of a year as in this case." The distinction seems logically and practically to turn upon anticipation of income payments over a reasonably short period of time and an out-and-out transfer of a substantial and durable property interest, such as a life estate at least is. See 57 Harv.L.Rev. 382; 54 Harv.L.Rev. 1405; 50 Yale L.J. 512, 515. Where the line should be finally placed we need not try to anticipate here. But we are clear that distinctions attempted on the basis of the various legal names given a transaction, rather than on its actual results between the parties, do not afford a sound basis for its delimitation. More rationally, to accept the respondent's contention we ought frankly to consider the Blair case as overruled, 50 Yale L.J. 512, 518, a position which, as we have seen, the Supreme Court itself has declined to take.

The parties are in conflict as to the valuation of the life estate; and we are returning the case to the Tax Court for computation, without, of course, assuming that there will necessarily be some tax.

Reversed and remanded.

FRANK, Circuit Judge (dissenting).

Taxpayer's father-in-law, by his will, created a trust by which taxpayer during her life was to receive the income from a fund of $100,000; the will provided that she was not to dispose of her interest or otherwise to anticipate the income. She joined with others interested in the trust to demolish it; in consideration of her doing so, she received a lump sum of $55,000.

The question is whether, with respect to that $55,000, resulting from the frustration of the testator's purpose through the destruction of the trust, she is entitled to the exceptional advantages of the capital gains provisions.

We must, then, ascertain the intention of Congress expressed in those provisions—especially § 117(a) (1)—in the light of the language it employed and the policy there embodied, i. e., we must determine whether Congress intended that a taxpayer who receives income in those circumstances should come within that exception.

My colleagues avoid a direct discussion of that problem. Instead, they rely on Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, which they hold to be controlling. But the court in the Blair case had no occasion to, and did not, consider § 117; it considered solely the interpretation of § 22(a). There, the holder of a life interest, created by a trust, had made a gift for life of a share of the future income. The only question was whether thereafter the donor, notwithstanding the gift, should be regarded, under § 22(a), as the recipient annually of that part of the income which was the subject of the gift and, consequently, should be taxed each year thereon. In other words, no capital gain or loss was involved, and the one issue was whether the donor or donee was annually taxable. The only conceivable ground for holding the donor liable was—as the court recognized in Helvering v. Horst, 311 U.S. 112, 61 S. Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655, and Harrison v. Schaffner, 312 U.S. 579, 61 S. Ct. 759, 85 L.Ed. 1055—that which moved the Court in Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, i. e., that, in terms of "non-material satisfactions" the donor had not, by the gift, changed his position and, because of his continued "enjoyment of the economic benefit," [311 U. S. 112, 61 S.Ct. 147] must still be regarded, within § 22(a), as receiving the income actually paid to the donee. In the Horst and Schaffner cases, the Court said the donor was thus within § 22(a); in the Blair case,

because the gift transferred the income for the duration of the donor's life, the Court held he was not. In the Schaffner case, the Court distinguished the Blair case, saying that there was a difference "between a *gift* of an equitable interest in property for life * * * of a share of the income of the trust and·the *gift* of the income or a part of it for the period of a year as in this case." [1]

Since the Court in the Blair case was not called on to say (as we are here) whether the taxpayer was liable under either § 22 (a) or under § 117, but only whether tax-payer was liable, if at all, under § 22(a), the Blair case sheds no light on the construction of § 117. Surely it does not follow merely (1) because one who makes a gift of a life estate does not retain such "non-material satisfactions" as to be liable under § 22(a), that (2) one who disposes of a life estate for a valuable consideration is to be treated as having disposed of a "capital asset" under § 117(a) (1) and is therefore entitled to the peculiar, exceptional, treatment accorded by the capital gains provisions. So, when it was argued that an interest which, pursuant to the Horst case, was "property" for purposes of § 22(a) must be "capital" for purposes of the capital gains provisions, the Supreme Court answered that " 'property' and 'capital' are not necessarily synonymous in the Revenue Act of 1932 or in common usage"; Hort v. Commissioner, 313 U.S. 28, 31, 61 S.Ct. 757, 758, 85 L.Ed. 1168.

In interpreting the capital gains provisions, we ought to have in mind that they have a legislative history and embody a legislative policy distinct, respectively, from the history and the policy embodied in § 22(a).[2] As we said recently, "It is well to remember that the concepts employed in construing one section of a statute are not necessarily pertinent when construing another with a distinguishable background." Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, 65. For that reason, I think the language used by the Supreme Court in Blair, a gift case under § 22(a), should not be

---

[1] 312 U.S. at page 583, 61 S.Ct. at page 762; emphasis added.

[2] See Judge Clark's recent detailed discussion of one aspect of the capital gains clauses in Commissioner v. Lamont, 2 Cir., 1946, 156 F.2d 800.

applied here.[3] Such an application, I think, involves the assumption that words, regardless of their context, have a constant meaning.[4]

The policy of the capital gains provisions is not in doubt: Congress believed that the exaction of income tax on the usual basis on gains resulting from dispositions of capital investments would undesirably deter such dispositions. To put it differently, Congress made an exception to § 22(a), in order to give an incentive to the making of such transfers. Having regard to that purpose, the courts have been cautious in interpreting the clauses creating that exception. They have refused to regard as "capital" transactions for that purpose divers sorts of transfers of "property," especially those by which transferors have procured advance payments of future income.[4a]

Those cases and Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168, seem to me to render it somewhat doubtful whether any transfer of a life estate for a valuable consideration is within § 117. The consideration paid for such a transfer is a substitute for future payments which would be taxable as ordinary income, and resembles the advance payment of dividends, interest or salaries. I am, therefore, not at all sure that Bell's Estate v. Commissioner, 8 Cir., 137 F.2d 454, is correct (although, for reasons noted below, I think it is not apposite here). It may well be that, had Congress specifically thought of the problem, it would explicitly so have defined "capital assets" as to exclude such an interest. I do not say that Hort v. Commissioner conclusively fixes that interpretation, but it does so suggest.[5]

It suggests far more strongly that we

[3] Judge Learned Hand said in 1933: "Although at times he says and believes that he is not doing so, what [a judge] really does is to take the language before him, whether it be from a statute or from the decision of a former judge, and try to find out what the government or his predecessor would have done, if the case before him had been before them. He calls this finding the intent of the statute or the doctrine. This is often not really true. The men who used the language did not have any intent at all about the case that has come up; it had not occurred to their minds. Strictly speaking, it is impossible to know what they would have said about it, if it had. All they have done is to write down certain words which they mean to apply generally to situations of that kind. To apply these literally may either pervert what was plainly their general meaning, or leave undisposed of what there is every reason they meant to provide for: Thus, it is not enough for the judge just to use a dictionary. If he should do no more, he might come out with a result which every sensible man would recognize to be quite the opposite of what was really intended. * * *" L. Hand, How Far Is A Judge Free in Rendering a Decision?, May 14, 1933.

In United Shipyards, Inc. v. Hoey, 2 Cir., 131 F.2d 525, 526, 527, we said: "In formulating the reasons for their decisions, judges often adopt rulings made in previous decisions in which the facts were somewhat similar, saying, in effect, 'This situation is sufficiently like those

which we previously considered so that we can disregard the differences and restrict ourselves to the resemblances.' And thus ignoring—for the purpose immediately at hand—the unlikenesses, the situations are frequently spoken of as identical. But eliptical discussions of cases partly alike, as if there were complete identity, is merely for convenience. There is present, although it may be unexpressed, an 'as if', * * * Such 'as if' or metaphorical thinking is invaluable in all provinces of thought (not excepting that of science). However, some of the greatest errors of thinking have arisen from the mechanical, unreflective, application of old formulations—forgetful of a tacit 'as if'—to new situations which are sufficiently discrepant from the old so that emphasis on the likenesses is misleading and the neglect of the differences leads to unfortunate * * * consequences." Cf. Holmes, Agency (1891) reprinted in Holmes Collected Legal Papers (1921) 49 et seq.

[4] United States v. Forness, 2 Cir., 125 F.2d 928, 932; cf. Commissioner v. Marshall, 2 Cir., 125 F.2d 943, 946, 141 A.L.R. 445; Irwin v. Simmons, 2 Cir., 140 F.2d 558, 560.

[4a] See, e. g., Helvering v. Smith, 2 Cir., 90 F.2d 590, 592; Levinson v. Commissioner, 2 Cir., 154 F.2d 60; Rhodes' Estate v. Commissioner, 6 Cir., 131 F.2d 50; cf. Ansorge v. Commissioner, 2 Cir., 147 F.2d 459, 461.

[5] A lower court, such as ours, is of course more hampered when interpreting a statute than the Supreme Court. For a lower court must take into account

cannot reasonably extrapolate the language of § 117 to include the transaction before us in the instant case.[6] In the Hort case, the Supreme Court held that the "prepayment of the discounted value of unmatured rental payments" to a landlord on the cancellation of a lease constituted "ordinary income," coming within § 22(a), and not within the capital gains clauses. The Court said, "Simply because the lease was 'property' the amount received for its cancellation was not a return of capital"; and it also said that "it is immaterial that for some purposes the contract creating the right to such payments may be treated as 'property' or 'capital'. * * * The can-

---

not only what it may think is the legislative policy but also what it thinks the Supreme Court has thought or will think is that policy.

It has been suggested that attempted prediction of judicial decisions is the function of practicing lawyers—or laymen—but never of judges; see Dickinson, Legal Rules, 79 Pa.L.Rev. (1930) 833. But judges of lower courts must try to foretell the decisions of upper courts and to render their own decisions, as far as possible, according to such prophesies or guesses. Foxboro Company v. Taylor Instrument Companies, 2 Cir., 1946, 157 F.2d 226; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636; Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 217, 218; The Attitude of Lower Courts to Changing Precedents, 50 Yale L.J. (1941) 1448.

Incidentally, even the highest court of any jurisdiction, when considering the precedential effects of its decision in a case, engages in prophesies of its own future decisions in other cases; sometimes, perhaps, too much stress is put on such future effects; see Aero Spark Plug v. B. G. Corporation, 2 Cir., 130 F.2d 290, 294–297.

[6] That the courts must often, in some such way—by "interpolation" and "extrapolation"—interpret statutes is a fact long ago recognized and often stated in recent times. See, e. g., Aristotle, Nicomachean Ethics, Book IV, Ch. XIV; Gray, The Nature and Sources of Law (2d Ed., 1921) § 370; Holmes, J., in Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194; authorities cited in Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 155 A.L.R. 761, notes 37–39; and in Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245; cf. Kantorowicz and Patterson, Legal Science, 28 Col.L. Rev. (1928) 678, 701–706.

Judge Hand, in the address above cited, rejected both the position of the "dictionary school" of interpretation and that of the other extreme school which urges that "a judge should not regard the law" but should "look into his own heart to find out what" an "honest man would think right" and construe the statute accordingly. Both were in error, he said: "The judge must always remember that he should go no further than he is sure the government would have gone, had it been faced with the case before him. If he is in doubt, he must stop, for he cannot tell that the conflicting interests in the society for which he speaks would have come to a just result, even though he is sure that he knows what the just results should be. He is not to substitute even his juster will for theirs; otherwise it would not be the common will which prevails, and to that extent the people would not govern. So you will see that a judge is in a contradictory position; he is pulled by two opposite forces. On the one hand he must not enforce whatever he thinks best; he must leave that to the common will expressed by the government. On the other, he must try as best he can to put into concrete form what that will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed." The judge, then, when interpreting a statute, must "act as if he were the government, because * * * he cannot otherwise do what he is required to do"; thus, unavoidably, he must engage in "law making" as well as in "law interpreting," for the distinction between the two "cannot be rigidly enforced." But his "law making" has sharp limitations.

For similar views, with specific reference to tax statutes, see the brilliant article by Eisenstein, Some Iconoclastic Reflections on Tax Administration, 58 Harv. L.Rev. (1945) 477, 520–522.

Paul remarks that judges, as they have not participated in the contriving of a tax statute, usually have little information about the details of legislative policy, "cannot know the premises and fine distinctions which the statutory language is designed to cover"; without awareness of "the many delicate relationships which link one tax provision to another," courts, unless they proceed warily, may well go astray. Paul, The Place of The Courts In The Taxing Process, an address before the National Tax Association, June 6, 1946. Cf. concurring opinion in Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 130 F.2d 290; Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243.

cellation of the lease involved nothing more than the relinquishment of the right to future rental payments in return for a present substitute payment and possession of the leased premises * * *" ; and it added that § 22(a) "does not distinguish rental payments and a payment which is clearly a substitute for rental payments."

That ruling is indeed suggestive here. For here we have these facts: The creator of the trust did everything he could to keep the taxpayer from disposing of her life interest.[7] Aided by what my colleagues described as "the ingenuity of counsel," she succeeded in frustrating his effort to prevent such alienation, by joining with the other persons interested in the trust to "extinguish" and "cancel" it;[8] the instruments she executed in that connection recited that the payment to her was "to represent the value of her life interest" and that the "settlement is based to a large extent upon her life expectancy." In that way, what the testator intended should be given to her only in instalments, she procured, in effect, in a lump sum payment.

I think it most unlikely that Congress intended by § 117 to relieve such a taxpayer of the ordinary tax burdens, to supply an incentive for the demolition of such a trust. That the life tenant in the Blair case in somewhat similar manner avoided the intent of the trust's creator is, I think, of no moment; for that conduct was not relevant to the issue of Congressional purpose there before the Court, i. e., whether § 22(a) made her taxable on the income subsequently paid her donee. But here the question is whether Congress meant that the exceptional benefits of § 117 should be accorded a taxpayer who, in disposing of her life interest, circumvented the avowed purpose of the creator of the trust. I think not.

Perhaps Bell's Estate v. Commissioner, 8 Cir., 137 F.2d 454, is distinguishable from the instant case. For there the creator of the trust had not sought to prevent alienation of the life interests, and it is arguable that furtherance of sales of such interests falls within the intention of § 117. But, since that question is not present here, I think we should leave it unanswered.

For the foregoing reasons, I think the tax Court's decision should be affirmed.

---

[7] His will and codicil contained the following provisions:

"I further direct that the income from the various trusts hereinabove created shall not be subject to any transfers, assignments or encumbrances, made or created by any of the respective beneficiaries, and shall not be subject to any suits, liens, judgments, attachments, or executions resulting from any debts or acts of any of the respective beneficiaries, nor shall the same be subject to any suits, actions or proceedings, of any kind, brought against any of them * * *

"I will and direct that all the shares of principal and income by this my will given to or directed to be held for the use and benefit of the several and respective beneficiaries in the Trusts in this my will mentioned or set out shall not be in any way or manner subject or liable to their or either of their anticipation, sale, pledge, debts, contracts, engagements or liabilities, and not subject or liable to attachment or sequestration under any legal or equitable or other process."

[8] The agreements, releases and court order containing that language are quoted in full in the opinion of the Tax Court, 5 T.C. 714.