**JONES, Collector of Internal Revenue v. CORBYN et al.**

No. 4110.

United States Court of Appeals Tenth Circuit.

Dec. 29, 1950.

Phillips, Chief Judge, dissented.

Helen Goodner, Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Robert N. Anderson, Leland T. Atherton, Sp. Assts. to Atty. Gen., and Robert E. Shelton, U. S. Atty., Oklahoma City, Okl., on the brief), for appellant.

H. L. Douglass, Oklahoma City, Okl. (John H. Halley, Jr., Oklahoma City, Okl., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Marmaduke Corbyn, Marmaduke Corbyn, Jr., and G. Scaling Corbyn, as taxpayers, brought this action against the Collector of Internal Revenue for the District of Oklahoma to recover income taxes paid as a result of his deficiency assessments. Judgment was for the taxpayers and the Collector has appealed. The question presented is whether $45,000 of a lump sum payment of $46,500 received by the taxpayers for the release of a life time general insurance agency contract should be treated for tax purposes as a long term capital gain or as ordinary income.

Marmaduke Corbyn was an experienced and successful life insurance agent. In 1934 he entered into a contract with Occidental Life Insurance Company of California whereby he became the exclusive agent of that company in Oklahoma for the solicitation of life insurance policies. The contract contained unusually attractive provisions. By a supplement and an amendment to the original contract, Marmaduke Corbyn, Jr., and G. Scaling Corbyn were recognized as partners with their father, Marmaduke Corbyn, and the partnership was to continue until the death of the last surviving member. Subagencies were established throughout the state and through the efforts of the partners and subagents the annual amount of insurance written rose to over $3,000,000. In 1944 difficulties arose which resulted in a civil action being brought against the company by the agents. The first cause of action in that suit was for a declaratory judgment to determine the validity of the contract and to declare the rights of the parties under it. Three other causes of action were for damages. While the case was being tried on the first cause of action, the parties entered into a written contract which terminated the agency contract and provided that the partnership should resign as agents and no longer solicit insurance on behalf of the company, and turn over to the company its office space and all books, records and files pertaining to the company business.[1] It was agreed that the agents had

[1] "9. The agency and the members shall turn over to the company possession of the space now being occupied by the agency in the Apco Tower, the entrance to such space being room numbered 1905, and the company shall pay the rent on such space from and after February 1, 1944. It is understood that the agency has paid rent on such space to February 1, 1944, and that the company shall have the right to use and occupy a portion of such space and facilities therein from and after the execution of this agreement. The agency and members may continue to use and occupy a portion of such space until February 1, 1944. The agency and the members shall leave in such space in the Apco Tower sufficient telephone equipment to enable the company to adequately carry on its business. Upon the execution of this agreement, the agency and members shall turn over to the company all furniture and equipment belonging to the company, and all

no claim against the company for damages on account of partial or total breach of the contract, but they did retain the right to receive renewal commissions on existing policies. The company paid the agents $46,500 of which $1,500 represented attorney fees to be paid the attorneys representing the agents in the litigation. In making their income tax returns, the taxpayers reported their proportionate share of the $45,000 as a long term capital gain. Upon audit and review of the returns, the Collector treated it as ordinary income and imposed the resulting deficiencies which were paid under protest.

The Collector contends that the contract was not a capital asset within the meaning of the Internal Revenue Code, Sec. 117 (a) (1), 26 U.S.C.A. § 117 (a) (1), which states that all "property" is "capital assets", with certain exclusions which are not material here. He argues that the taxpayers had nothing more than an employment contract to perform services requiring special skill and granting to them the privilege of soliciting insurance for the company; that it is not property which is susceptible of ownership for a length of time as is a share of stock or a bond; and upon termination of the contract all the company received and paid for in advance was a promise by the agency not to exercise this privilege. We do not agree with this contention. The contract or franchise had at all times substantial value. It was capable of producing income for its owner. It was enforceable at law and could be bought and sold. Acting under its provisions, the agents developed a large and lucrative business. The evidence was without conflict that the value of the contract and the business formed the basis for the final purchase price. The evidence was also without conflict that the minimum value of this particular contract and business was not less than $45,000. The business was built up through the efforts of the taxpayers continuing over a number of years and appreciated in value during these years. It was a thriving business netting approximately $30,000 per year to the agency. Except for the renewal commissions, the effect of the termination contract was to transfer the business to the company intact.

The statutory definition of capital assets includes all property not excluded. Mertens Law of Federal Income Taxation, Vol. 3, Sec. 22.04. If the thing given up by the taxpayers is property within the meaning of the statute, then, of course, it is a capital asset. The term "capital assets" should not be considered in a technical or restricted sense but should be given its ordinary meaning. Lynch v. Alworth-Stephens Co., 267 U.S. 364, 369, 45 S.Ct. 274, 69 L.Ed. 660; Commissioner of Internal Revenue v. Shapiro, 6 Cir., 125 F.2d 532, 535, 144 A.L.R. 349; Investment & Securities Co. v. Robbins, D. C., 49 F. Supp. 620, affirmed Investment & Securities Co. v. U. S., 9 Cir., 140 F.2d 894. Property may be tangible or intangible such as a franchise or good will. Fidelity & Deposit Co. of Maryland v. Arenz, 290 U.S. 66, 68, 54 S. Ct. 16, 78 L.Ed. 176; Cleveland Allerton Hotel Inc. v. Commissioner of Internal Revenue, 6 Cir., 166 F.2d 805, 807; Hoyd v. Citizens Bank of Albany Co., 6 Cir., 89 F.2d 105, 107; Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 173 F. 2d 170, 175. In Citizens State Bank of Barstow, Texas, v. Vidal, 10 Cir., 114 F.2d 380, 382, the court defined property as "a word of very broad meaning and when used without qualification, may reasonably be construed to include obligations, rights and other intangibles, as well as physical things. 'Property' within the tax laws should not be given a narrow or technical meaning." We think that what the taxpayers owned in this case was a capital asset.

The Collector also asserts a contention that the cancellation of the agency contract did not constitute a sale or exchange within the meaning of Sec. 117 of the In-

---

records, books and files pertaining to the company's business. The company shall deliver to the agency '15 Y Cards,' now in said office, or at the option of the company duplicates of such cards. It

is understood that the company is free to give employment to Lora Trout, who is at the present time employed by the agency."

ternal Revenue Code. He relies principally upon analogy of Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 and similar cases. The Hort case presents an entirely different situation. There the taxpayer was the owner of a building, a portion of which was leased to a trust company for a period of fifteen years at an annual rental of $25,000. The trust company desired to be relieved of the rental obligations in the lease and the same was cancelled upon the payment to the taxpayer of $140,000. The court held that this was the payment of rentals for the unexpired period of the lease and taxable under Sec. 22 (a) of the Internal Revenue Code, 47 Stat. 169, 178, 26 U.S.C.A. § 22(a). The settlement there was no more than an agreement as to how much rental the lessee would pay as provided for in the lease. It is not comparable to the sale and transfer of a going business under an exclusive contract.

 Broadly speaking, a sale is a transfer of property for a valuable consideration. Burger-Phillips Co. v. Commissioner of Internal Revenue, 5 Cir., 126 F.2d 934, 936; Pender v. Commissioner of Internal Revenue, 4 Cir., 110 F.2d 477, 478, certiorari denied 310 U.S. 650, 60 S.Ct. 1103, 84 L.Ed. 1416; Hawaiian Gas Products v. Commissioner of Internal Revenue, 9 Cir., 126 F.2d 4, 5, certiorari denied 317 U.S. 653, 63 S.Ct. 48, 87 L.Ed. 525. By terminating the contract and transferring the business to the company, there was a sale and transfer of a capital asset within the meaning of the statute.

 It is true that the contract released any and all claims for damages which the taxpayers might have against the company and dismissed the litigation with prejudice. Generally, amounts received as damages in litigation are ordinary income. Helvering v. Safe Deposit Co., 316 U.S. 56, 62 S.Ct. 925, 86 L.Ed. 1266; Lyeth v. Hoey, 305 U.S. 188, 59 S. Ct. 155, 83 L.Ed. 119; Raytheon Production Corp. v. Commissioner of Internal Revenue, 1 Cir., 144 F.2d 110, certiorari denied 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed.

622; Swastika Oil & Gas Co. v. Commissioner of Internal Revenue, 6 Cir., 123 F. 2d 382, certiorari denied 317 U.S. 639, 63 S.Ct. 30, 87 L.Ed. 515; Parker v. Commissioner, 5 T.C. 1355. Income received must be considered in the light of the source from which it was realized. Swastika Oil & Gas Co. v. Commissioner of Internal Revenue, supra; Farmers' and Merchants' Bank v. Commissioner of Internal Revenue, 6 Cir., 59 F.2d 912. The amount of the settlement in this case was not based upon damages. It was based upon the value of the exclusive business franchise. The fact that the suit ended in a compromise settlement does not change the nature of the recovery. The nature of the basic claim from which the amount is received is the determining factor. Raytheon Production Corp. v. Commissioner of Internal Revenue, supra. The amount recovered here was based on the value of the contract and the business and was not damages or prospective profits.

The judgment is affirmed.

PHILLIPS, Chief Judge (dissenting).

Prior to May 14, 1934, Marmaduke Corbyn, Sr. had built up a large general agency in Oklahoma for the Central States Life Insurance Company. On that date, Marmaduke Corbyn, Sr. entered into a contract with Occidental Life Insurance Company[1] to act as its exclusive agent in the State of Oklahoma for the purpose of soliciting insurance and collecting and remitting first-year premiums, and with power to appoint subagents with Occidental's approval. The contract provided for a scale of commissions, varying with the type of policy written, on first-year premiums; for a bonus on second-year premiums, depending on the percentage of business renewed during such second year; and for renewal commissions of 7½% of renewal premiums for the second to the twentieth policy years. By a supplemental contract entered into on August 28, 1936, it was provided that on August 24, 1936, the original agreement should be amended by substituting for Marmaduke Corbyn, Sr., the Marmaduke Corbyn Agency, a co-

---

1. Hereinafter called Occidental.

partnership consisting of Marmaduke Corbyn, Sr. and Marmaduke Corbyn, Jr.,[2] and that when George Scaling Corbyn should attain his majority on July 31, 1938, he should become a member of such co-partnership. The contract and supplemental contract provided for the renewal of the contract, subject to stated conditions, at the end of each contract year. Such renewal provision was to remain in force during the life of the last surviving member of the partnership. The contract was again amended by a supplemental agreement entered into on June 15, 1938. It provided for an allowance to the general agent of $500 per month, and in addition amounts incurred by the general agent for rental for the Oklahoma City office, for advertising, postage, telephone and telegraph expense, and for necessary replacement of furniture and equipment.

Controversies arose between Occidental and the partnership, as a result of which the partnership, on October 2, 1942, commenced an action against Occidental in the United States District Court for the Western District of Oklahoma.

On January 20, 1944, Occidental and the partnership entered into an agreement which recited the original contract on May 14, 1934, and the supplemental and amendatory agreements, and that the parties desired to terminate the relations theretofore existing between them and compromise and settle the action referred to above. It provided that the agency contract should be terminated; that the partnership should resign as general agent or agents of Occidental; that neither the partnership nor its members should solicit applications for insurance on behalf of Occidental; and that pending applications for insurance should be considered and acted upon by Occidental. It further provided for the payment of any unpaid balance of commissions on first-year premiums, and that the rights of the parties with respect to renewal premiums under the contracts should be governed by the terms and provisions of such contracts, and released any claim or claims the agency had against Occidental

for alleged breach of the agency contracts. In consideration thereof, Occidental agreed to pay the partnership $46,500, $45,000 of which was paid for the termination of the agency contract, except as to commissions referred to above. The partnership and the individual partners returned the $46,500 as a long-term capital gain. The Commissioner of Internal Revenue assessed deficiencies, treating such gain as ordinary income. The appellees paid the deficiencies under protest and brought this action against the Collector to recover.

The question involved is whether the $46,500 received by the partnership in 1944 was taxable as a long-term capital gain under § 117 of the Internal Revenue Code, or taxable as ordinary income.

The contracts gave the partners an exclusive agency in the State of Oklahoma. Under it they were entitled to receive as compensation for services rendered commissions on first-year premiums for business currently written, bonuses on second-year premiums, and renewal commissions on renewal premium payments from the second to twentieth policy year, inclusive.

The compromise agreement left undisturbed commissions earned and renewal commissions. The partnership did not sell or transfer the agency contract. What it did was release the principal, Occidental, from such contract by terminating it, except as to commissions on business already written. The only thing that the partnership surrendered was the right thereafter to act as agents of Occidental, to solicit applications for insurance, and to earn commissions on first-year premiums and renewal premiums. The partnership did not transfer to Occidental tangible assets of any consequence. On the termination of the contract, of course Occidental was entitled to occupy the leased premises for which it was advancing the rental. Occidental did not acquire the right to use the name of the partnership, or to otherwise receive benefit from the good will built up by the partnership. Of course, any good will which inured to Occidental as a life insurance company, as a re-

sult of the agent's services belonged to Occidental, the principal. Occidental did not by virtue of the compromise agreement take over a going business. It had to build or acquire a new agency and subagency personnel. In other words, what the partnership relinquished was the right to continue to render services of a personal nature, as the agent of Occidental—the agency contract not being transferable without the consent of Occidental—and to earn commissions as compensation for such services. Such commissions, had they been earned, would have constituted ordinary income. A lump sum paid for the surrender of the right to render such services and earn such commissions likewise, it seems to me, constituted ordinary income.

The case is distinguishable from Smoak v. Commissioner of Internal Revenue, 43 B.T.A. 907. There, the taxpayer acquired an exclusive agency for leasing and licensing machines used in distributing milk and other dairy products in paper containers, under which he was to receive a portion of the royalties paid by the lessees or licensees in his territory. He also entered into contracts for the installation and minor maintenance of the machines. Thereafter, after he had established a business and had a large number of existing contracts in which he would currently receive portions of the royalties paid by the lessees and licensees, he transferred his contract to the successor to the other party to the contract, in consideration of $26,000 in cash and $19,200 to be paid in installments over a period of time. The Tax Court held that the transaction was a sale of capital assets. The court said: "By the agreement of April 23, 1936, the petitioner transferred to the Ex-Cell-O Aircraft and Tool Corporation all of the rights inuring to him from the original contract with the American Paper Bottle Co. He relinquished his exclusive right to develop the sales territory allotted to him, the right to all royalties from future sales within that territory, and his right to the future royalties to be paid by existing licensees. He transferred also his office files and records and the good will which he had built up over the course of two years. This was much more than the assignment of a mere contractual right to receive royalties in the future. The petitioner had a going agency business. He sold off all of the assets of that business, with all of his rights under the agency contract to the Ex-Cell-O Aircraft & Tool Corporation."

I think the case is more analogous to McFall v. Commissioner of Internal Revenue, 34 B.T.A. 108 and Gann v. Commissioner of Internal Revenue, 41 B.T.A. 388.

For the reasons indicated, I respectfully dissent.