**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**The PITTSTON COMPANY, Respondent.**

**No. 32, Docket 24531.**

United States Court of Appeals Second Circuit.

Argued Dec. 6, 1957.

Decided Feb. 11, 1958.

Davis W. Morton, Jr., Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

Rollin Browne, New York City (Joseph J. Pugh, and Satterlee, Browne & Cherbonnier, New York City, on the brief), for respondent.

Before CLARK, Chief Judge, MOORE, Circuit Judge, and SMITH, District Judge.

SMITH, District Judge.

This is a petition by the Commissioner of Internal Revenue for review of a decision of the Tax Court of the United States reported in 26 T.C. 967, holding

the taxpayer The Pittston Company entitled to treat the sum of $500,000 received in 1949 as consideration for the termination of an exclusive contract to purchase the output of Russell Fork Coal Company's leased Pike County coal mines, as long term capital gain, derived from a sale or exchange within the meaning of Section 117(a) (4) of the Internal Revenue Code of 1939. The pertinent sections of the statutes are as follows:

"§ 22. Gross Income. (26 U.S. C.1952 ed., Sec. 22)

"(a) General Definition.—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

* * * * * *

"§ 117. Capital Gains and Losses. (26 U.S.C. 1952 ed., Sec. 117)

"(a) Definitions.—As used in this chapter—

"(1) (As amended by Sec. 115 (b), Revenue Act of 1941, c. 412, 55 Stat. 687, and Sec. 151(a), Revenue Act of 1942, c. 619, 56 Stat. 798) Capital Assets.—The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or

business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), or an obligation of the United States, or any of its possessions, or a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer;

* * * * * *

"(4) (As amended by Sec. 150(a) (1), Revenue Act of 1942, supra) Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income; * * *".

The Pittston Company and its wholly owned subsidiary, Pattison & Bowns, Inc., filed consolidated returns for the taxable year 1949. The subsidiary, which was the contracting party with Russell Fork Coal Company (hereinafter called Russell) and the recipient of the amount in question, will be referred to as the taxpayer.

On January 25, 1944, taxpayer (as buyer) and Russell (as seller) entered into a written contract, which provided, in part, as follows:

"That in consideration of the mutual covenants and conditions herein set forth and of an agreement executed and delivered simultaneously with the execution and delivery of this agreement, it is agreed as follows:

"(1) Subject to the provisions of Paragraph 2 of this agreement the Seller (Russell Fork) agrees to sell to the Buyer (Pattison & Bowns), and any other affiliated person, partnership or corporation whom and which the Buyer may from time to time designate in writing, F.O.B.

the mine, all of the coal which shall be mined and sold for resale from the mining plant or plants which the Seller expects to install or does install upon its leased property in Pike County, Kentucky, as set forth in the agreement executed simultaneously herewith.

\* \* \* \* \* \*

"(3) The title to all coal sold to the Buyer hereunder shall pass to the Buyer at the time said coal is loaded into cars or trucks at the mines for transportation and before transportation begins.

"(4) The Buyer shall be entitled to and is hereby authorized to deduct a discount of 8% of the gross selling price on all coal purchased by it, which amount shall include all expenses and compensation of every kind of the Buyer and its designees and under no circumstances shall any affiliate of the Buyer be entitled as a wholesaler, jobber or otherwise to any additional discount, compensation and expenses all of which shall be included in the foregoing 8%, \* \* \*.

\* \* \* \* \* \*

"(6) The Buyer agrees for itself and its designees and binds itself and each of them that it and each of them will at all times have and maintain proper facilities and employees so as to be able efficiently to resell the said coal and agrees to endeavor with diligence and in every proper manner to resell the largest available amount of said coal at prices specified from time to time by the Seller, and further agrees to comply with all laws that are now in force, or may hereafter be enacted, and all valid rules and regulations thereunder relating to the selling of coal or all other related or incidental matters. \* \* \* if the Buyer and its designees, as the case may be, complies with the obligations binding upon it and them, then this agreement shall be irrevocable for a period of ten (10) years from this date and for such additional period of extensions as is provided in Paragraph 3 of the agreement executed and delivered simultaneously with the execution and delivery of this agreement. \* \* \* "

On the same date, January 25, 1944, taxpayer and Russell entered into another contract, under the terms of which taxpayer agreed to loan Russell $250,000, which loan was to be repaid in periodic installments over a period of 10 years and was to bear interest at 4 per cent per annum. During the period January 25, 1944 to October 14, 1949, taxpayer purchased from Russell 1,959,-563.15 tons of coal for $9,855,089.64 which it resold at a gross profit of $273,-411.14. Taxpayer carried out its agreement to loan Russell $250,000 and it also made various additional advances on open account; these loans were finally liquidated by Russell during 1948. On October 14, 1949, Russell paid $500,000 to taxpayer in consideration of taxpayer's surrender of all of its rights under the coal agreement of January 25, 1944. The transaction was reflected in a letter agreement dated October 14, 1949; the letter was sent to Russell by taxpayer, and read as follows:

"In consideration of the payment by you to us of the sum of Five Hundred Thousand Dollars ($500,-000), receipt of which is hereby acknowledged, it is understood that you have as of this day acquired all of our right and interest in and to the agreement dated January 25, 1944 between us, which agreement provides for the exclusive right by Pattison & Bowns, Inc. to purchase all of the coal produced by you at your Russell Fork Mine, said contract expiring by its terms on January 25, 1954."

In its income tax return for the year 1949, taxpayer reported the $500,000 as long-term capital gain. In his notice of deficiency, the Commissioner determined that this amount "was not received as the result of a sale or exchange and therefore is reportable as ordinary in-

come." The Tax Court held that the $500,000 was taxable as long-term capital gain, not as ordinary income, and accordingly overruled the Commissioner.

The courts have not been entirely consistent in their treatment of lump sum payments received by a taxpayer for the termination of jural relations between the taxpayer and another as falling within or without the area entitled to more favored treatment as long-term capital gains rather than ordinary income.[1] This circuit has steered a middle course. In McAllister v. C. I. R., 2 Cir., 157 F.2d 235, payment received for transfer by a taxpayer of a life interest in a trust to a remainderman was held a capital gain, Judge Frank dissenting. The McAllister holding and its possible consequences were criticized in Judge Frank's dissent and in comments on the problem in law journals (see 56 Yale L.J. 570–574 and 14 U. of Chic.L.Rev. 484–493). The court thereafter held in C. I. R. v. Starr Bros., 2 Cir., 204 F.2d 673, that payment received by a taxpayer, a New London retail druggist, for relinquishing its rights under a provision in a contract with a manufacturer, binding the manufacturer not to sell drugs to taxpayer's competitors in New London, was ordinary income and not a capital gain. In the same year, consistently with Starr, the court in General Artists Corp. v. C. I. R., 2 Cir., 205 F.2d 360, certiorari denied 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376, held that payments received by a taxpayer for transfer of its contracts with a singer as his exclusive booking agent to another such agent by an agreement providing for cancellation of the contracts and execution of new contracts with the singer by the transferee were ordinary income and not capital gains received as gain from sale of a capital asset. However, in C. I. R. v. McCue Bros. & Drummond, Inc., 2 Cir., 210 F.2d 752, the court held a payment received by a taxpayer lessee from a landlord for vacating premises where the taxpayer had a right to continued possession under rent control laws was a capital gain from the sale or exchange of a capital asset held more than six months. In so doing the court followed the third circuit in C. I. R. v. Golonsky, 3 Cir., 200 F.2d 72, certiorari denied 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366, holding payment received by a lessee from the landlord for cancelling the lease and surrendering the premises to be a capital gain. The court distinguished Starr and General Artists because there the contractual right was not transferred, but was released and merely vanished. The right to possession of the realty was considered a more substantial property right which does not lose its existence when it is transferred.

The Tax Court in the instant case concluded that the contractual right held by the taxpayer constituted capital assets, which petitioner does not dispute, and concluded that the right was not extinguished by its cancellation, but continued to exist as property of the transferee-payor. It distinguished Starr and General Artists on the ground that the court had held in those cases the contractual right was not transferred, but was released and merely vanished. The Tax Court says in effect that the extinguishment of a contract duty to deal only with one person transfers to the one formerly bound a right to deal with all the world. It would be more in accord with common understanding to say that the payment is solely for the termination of the right-duty relationship between the two parties to the agreement. To be sure, the same might be said of the termination of lessee's or life tenant's rights, but they have been distinguished as relating to matters of greater "substance" than mere contract rights.

1. Bingham v. C. I. R., 2 Cir., 105 F.2d 971; McAllister v. C. I. R., 2 Cir., 157 F. 2d 235; Jones v. Corbyn, 10 Cir., 186 F. 2d 450; C. I. R. v. Golonsky, 3 Cir., 200 F.2d 72; C. I. R. v. Starr Bros., 2 Cir., 204 F.2d 673; General Artists Corp. v. C. I. R., 2 Cir., 205 F.2d 360; C. I. R. v. Ray, 5 Cir., 210 F.2d 390; C. I. R. v. McCue Bros. & Drummond, Inc., 2 Cir., 210 F.2d 752; C. I. R. v. Goff, 3 Cir., 212 F.2d 875; Roscoe v. C. I. R., 5 Cir., 215 F.2d 478; Marc D. Leh, 27 T.C. 892.

The instant case appears on the facts closer to the payment for the extinguishment of the taxpayer's rights under the negative covenant in Starr than to the cases such as McAllister where a life estate was transferred to the remainderman, or the release of right to possession of realty under lease or otherwise as in McCue and in Golonsky. While the contract right here surrendered was "property" of value it carried with it no direct interest in the mine itself, or in the coal produced until delivery f. o. b. car or truck. It was a naked contract right, not in the nature of a lease or profit à prendre. If Russell Fork was able to do better elsewhere it might have sold its coal through anyone, responding in damages to the taxpayer, for so far as appears similar coal would have been obtainable elsewhere by taxpayer at a price. The large amount received by the taxpayer for the 4½ years the contract had to run compared with its gross returns for the 5½ years already expired, while not explained on the record, may reflect an expectation of lower expense to the taxpayer since taxpayer no longer is financing Russell. In any case, the cancellation brought the taxpayer at one time a return which it might otherwise have realized over a relatively short period of years as ordinary income under the sales contract. Whatever brought it about, it suggests a possible method of returning future income to a taxpayer in a lump sum from the other contracting party in advance for tax avoidance purposes, which the court has been unwilling to sanction except where the consideration surrendered had more "substance" than mere contract rights.

The Congress has since the tax year here in question more fully provided for the application of the sale or exchange concept when a lease or distribution agreement is cancelled, by Section 1241 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1241, allowing the more favorable capital gains treatment of the amount received on cancellation, but in case of distributorships only where the distributor has a "substantial invest-ment" in the distributorship, as in facilities for storing, processing, etc. the physical product or as in maintaining a substantial inventory. This amendment is not applicable in this case, and of course no showing was made as to whether such a substantial investment in facilities or inventory was or was not maintained. The amendment is of little assistance in interpreting the original provision for we cannot tell whether the intent of Congress was to broaden or narrow the capital gains on sale or exchange exception to the income tax, and its apparent result falls somewhere between the contentions of the opposing parties here. See Senate Report on H. R. 8300, 3 U.S.Code Cong. & Adm.News, 83rd Cong., 2nd Session, 1954, pp. 5087, 5088, Conf. Report, id. p. 5332. The heavy burden of income taxation inevitably leads to the broadening of exceptions such as the capital gains provision. This court has endeavored to define what it conceived to be the limits to this exception in Starr and United Artists by a somewhat literal definition of "sale or exchange." Even though the logic of setting the limit by drawing the line where it now is may be open to debate, any line set must be to some degree arbitrary. This case falls outside the limit thus far set for the exception by this court. We should leave further expansion of the exception, to include the release of naked contract rights as a "sale," to legislative action.

The judgment of the Tax Court is reversed and the case is remanded for entry of judgment in favor of the Commissioner in accordance herewith.

MOORE, Circuit Judge.

I dissent. The assumption of the majority that mere "naked contract rights" form the basis of this transaction is, in my opinion, contrary to the undisputed facts and the law applicable thereto.

The only question involved upon this appeal is whether the sum of $500,000 paid by Russell to Pittston on October 14, 1949 for which Russell "acquired all

of our [Pittston's] right and interest in and to the agreement dated January 25, 1944 between us," should be taxed as a long-term capital gain or as ordinary income. The answer to this question depends upon a precise analysis of the rights and interests then existing between the parties.

In 1944 Russell held a lease on certain real estate in Pike County, Kentucky. In order to enable it to install a coal mining plant thereon Pittston, pursuant to a contract with Russell dated January 25, 1944, agreed to loan Russell $250,000 to be advanced in such amounts as required for "the installation by it of a coal mining plant, and for the operation thereof" (Exh. 1–A). Pittston was given the right to designate a director or directors to the extent of one-third of the board and Russell's expenditures of the proceeds of the loan had to be approved by him or them. Restrictions were placed upon the payment of salaries to Russell's officers and the use of net earnings. Notes evidencing the loan were to be secured by a mortgage upon the lease and structures to be placed upon the property. At the same time Russell and Pittston made a second contract whereby Russell agreed to sell to Pittston "all of the coal which shall be mined and sold for resale from the mining plant or plants which the Seller expects to install or does install upon its leased property in Pike County, Kentucky, as set forth in the agreement executed simultaneously herewith," i. e., the loan agreement, for a period of ten years. Ten cents per ton was to be deducted by Pittston from all coal sold "pursuant to the coal sales agreement entered into simultaneously herewith" to be applied on the loan. By reason of these provisions the $250,000 loan was repaid by the end of 1948.

Thus, the business arrangement between these companies was not confined to a "naked contract right" (as the majority holds) to buy coal but was an integrated transaction whereby Pittston financed the construction of a coal mining plant on Russell's leasehold and agreed to take the entire output, f. o. b. the mine, for ten years with conditional extension possibilities. The two simultaneous agreements, each referring to the other, evidenced the transaction. These contract rights can only be rendered "naked" by stripping from them and discarding the raiments which the parties found to be essential. To say that Russell despite its commitment could sell to anyone responding only in damages on the assumption that similar coal could have been obtained elsewhere (as to which there is no proof in the record) is, first, to suggest that these companies would not honor their mutal obligations and, second, that the courts in view of the investment of Pittston in the Russell operation and the nature of the agreement (entire output for a period of years) would restrict relief to damages. "Contracts for the delivery of goods will be specifically enforced, when by their terms the deliveries are to be made and the purchase price paid in installments running through a considerable number of years" (Eastern Rolling Mill Co. v. Michlovitz, 157 Md. 51, 145 A. 378, 383). Specific performance is particularly applicable to a contract "to continue over a period of years without rigidity of price" (Hunt Foods v. O'Disho, D.C.N.D. Cal.1951, 98 F.Supp. 267, 270, a contract to sell to plaintiff defendant's entire peach crop for a period of five years at prices to be fixed by a Canning Association). See also Michigan Sugar Co. v. Falkenhagen, 243 Mich. 698, 220 N.W. 760 (a contract to sell entire output of sugar beets grown in a given area—specific performance decreed against vendor); Pittenger Equipment Co. v. Timber Structures, 189 Or. 1, 217 P.2d 770.

The mutual rights and obligations created by these two agreements were most substantial. Russell as effectively deprived itself of any other use of its property for ten years as the owner of a building granting a leasehold for ten years to a tenant who had loaned the money to construct it. Russell could only regain for itself the unrestricted use of its property by a surrender by Pittston

tantamount to the voluntary termination of a leasehold prior to the expiration date. Pittston, in turn, not only had an investment in Russell's lease, plant and equipment but had a property right to acquire the entire output of the Russell mine which proved to be a right of substantial value.

Nor can the $500,000 payment be regarded as anticipated income for the five remaining years of the contract. As the majority concede, the large amount paid bears no relationship to future income projected on the basis of the gross income realized by Pittston for the previous five and one-half years. Pittston's income was not assured or guaranteed; it was entirely dependent upon its ability to conduct its business operations at a profit. The $500,000 paid was the value to Russell to get its property back and also represented Pittston's opinion of the contract's worth. If the contract were assigned to a third party there would be no question that the consideration received would reflect the value of the asset sold. Yet for all practical purposes Pittston by such assignment would thereby have terminated or cancelled its right to purchase coal from Russell.

In endeavoring to find a guide as to the type of transaction which will be construed as resulting in a capital gain as distinguished from ordinary income, the decisions reveal uniform consistency in holding that the surrender, termination or cancellation for monetary consideration of a capital asset results in a capital gain. Neither the petitioner nor the majority assail the correctness of the Tax Court's conclusion that the contract right here was in itself a capital asset. For this reason I must disagree with the majority that "the termination of the right-duty relationship between the two parties" results in ordinary income to the taxpayer; particularly since they concede that "the same might be said of the termination of the lessee's or life tenant's rights" which clearly produces a capital gain. Judge Goodrich noted the fallacy of this approach when he wrote "To call the transaction a cancellation or

termination of a lease and not a sale is, we think, to assume the point to be decided." Commissioner of Internal Revenue v. Golonsky, 3 Cir., 1952, 200 F.2d 72, 73. In Golonsky a tenant had surrendered possession of leased premises prior to the expiration of the lease upon the payment of a sum of money. Holding this to be a capital gain the court said "Undoubtedly there is a cancellation of the lease when the tenants voluntarily surrender the premises to a landlord in accordance with an agreement, but the fact that the cancellation occurs does not negative the fact that the transaction may constitute a sale."

Searching for a firmer support, an attempt is made to find in the words "substance" or "substantial rights" whether a capital asset is involved and then give uniform treatment regardless of whether the asset is "sold" or "terminated." Prior to the decision of the majority in this case there seemed to be consistency among the various Courts of Appeals in applying this test. In 1950 the Tenth Circuit (Jones v. Corbyn, 10 Cir., 1950, 186 F.2d 450) held that the surrender of an exclusive life insurance agency to an insurance company for a lump sum payment of $45,000 was a long-term capital gain and not ordinary income. Answering the Collector's argument that the contract was not a capital asset the court said "The contract or franchise had at all times substantial value. It was capable of producing income for its owner. It was enforceable at law and could be bought and sold" (at page 452). The court's conclusion was that "By terminating the contract and transferring the business to the company, there was a sale and transfer of a capital asset within the meaning of the statute" (at page 453). In the Fifth Circuit a lessee merely surrendered to his lessor a restriction against renting any space in the block to a Variety Store for which surrender he received $20,000. Despite the fact that this was the surrender of only one of the many rights granted under the lease the court affirmed a decision of the Tax

Court in holding the amount received to be a capital gain (Commissioner of Internal Revenue v. Ray, 5 Cir., 1954, 210 F.2d 390). In the same year this Court in Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 2 Cir., 1954, 210 F.2d 752, held that the payment of $22,500 to a lessee to vacate store premises to enable another tenant to occupy the space constituted a capital gain and affirmed a Tax Court decision to that effect. This Court agreed both with the Ray decision and the decision of the Third Circuit in Commissioner of Internal Revenue v. Golonsky, 3 Cir., 1952, 200 F.2d 72, certiorari denied 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366. The court distinguished its previous decisions in Commissioner of Internal Revenue v. Starr Bros., Inc., 2 Cir., 1953, 204 F.2d 673, and in General Artists Corp. v. Commissioner of Internal Revenue, 2 Cir., 1953, 205 F.2d 360, certiorari denied 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376. The court felt that the surrender by the tenant and the cancellation and termination of his right to stay in possession "seems closer to those cases holding that gain derived by the holder of a life interest upon sale to the remainderman is to be taxed as a capital gain" (210 F. 2d 752, 753) citing McAllister v. Commissioner of Internal Revenue, 2 Cir., 1946, 157 F.2d 235. In the same year the Third Circuit again considered a problem of the surrender of contract rights to the exclusive product of four machines in exchange for stock in Commissioner of Internal Revenue v. Goff, 3 Cir., 1954, 212 F.2d 875, 876, the Commissioner contending that the transfer of these rights constituted ordinary income relied on the Starr Bros. and General Artists cases in this Circuit but Judge Goodrich pointed out that "the last word on the subject in the Second Circuit is Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., [2 Cir.], 1954, 210 F.2d 752, which held that payment made by a lessor to a lessee so that he would vacate the premises was a capital gain." He found that "[T]he Starr and General Artists decisions were distinguished on the ground that the rights therein involved were less substantial." Referring to McCue Bros. & Drummond he recognized this decision as being "in accord with the cases cited above, and we think it is right" but that "whether the Second Circuit cases are in harmony is not a matter for us to decide" (212 F.2d 875, 876). The court affirmed the Tax Court decision saying "there is certainly no doubt that the right that Saxon had to the exclusive product of these four machines was a substantial right and, if it is important, it was a right connected with the use of specific tangible property, that is, the machines themselves" (at pages 876, 877).

Legal rights should not be adjudicated by mere choice of words. "There surely cannot be that efficacy in lawyers' jargon that termination or cancellation or surrender carries some peculiar significance vastly penalizing laymen whose counsel have chanced to use them" (McAllister v. Commissioner of Internal Revenue, supra, 157 F.2d at page 236). Moreover, here the parties did not even use the word "surrender" but said that Russell had "acquired all of our right and interest." That "there was a 'surrender' to the remainderman, rather than a 'transfer' to third persons * * * does not change the essentially dispositive nature of the transaction so far as the former property owner is concerned" (McAllister, supra, at page 237). So here Pittston had effectively disposed of its property interest. Whether by surrender or transfer or acquisition the legal consequences should be the same.

"Setting the bounds to the area of tax incidence involves the drawing of lines which may often be of an arbitrary nature. But they should not be more unreal that the circumstances necessitate" (McAllister, supra, at page 237). Accepting as sound the proposition "that distinctions attempted on the basis of the various legal names given a transaction, rather than on its actual results between the parties, do not afford sound basis for its delimitation" (McAllister, supra, at page 237), what distinction

should be applied here? Obviously, the $500,000 was not in "anticipation of income payments over a reasonably short period of time" (at page 237) because income was not assured. But even the surrender of life estates to the remaindermen has received consistent recognition by the courts as placing profit in the category of capital gains (Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465; McAllister, supra; Bell's Estate v. Commissioner of Internal Revenue, 8 Cir., 1943, 137 F.2d 454). The suggestion of the majority that the lump sum payment of $500,000 was made "for tax avoidance purposes" and therefore should be considered as ordinary income would be equally applicable to the life estate surrender, leasehold cancellation and agency termination cases.

The Commissioner bases his argument almost exclusively on Commissioner v. Starr Bros., supra, which he asserts "is not distinguishable in any material aspect." The majority finds the facts of the present case closer to those in Starr Bros. than in the cases involving the surrender of the insurance agency contract, the release of a covenant not to rent to a specific type of store, the surrender of a leasehold and a life estate.

To test the applicability of a decision relied upon as a precedent it is always useful to substitute the facts in a reciprocal manner. First applying the Pittston facts to Starr Bros., it would be necessary to assume that Starr Bros., a drug store in a city of some 30,000 population, had agreed to build a factory for the United Drug Company and to purchase its entire output of drugs and distribute them throughout the country for a period of ten years. Conversely, had Russell paid a small amount to Pittston for the privilege of selling some of its coal to others while keeping its contractual relationship with Pittston otherwise in force then an analogous situation might have existed. The mere statement of these hypothetical situations, however, illustrates how lacking they are in factual similarity. The same is true of the General Artists case.

I cannot agree that the property rights created by the two agreements between Pittston and Russell were mere "naked contract right" but find them clothed not only with a mortgage interest in the Russell leasehold until the repayment of the loan but also with sufficient substance to justify specific performance. Nor do I think that the Starr Bros. case, [204 F.2d 674] which by the court's own analysis was restricted to a small payment for "the taxpayer's release of United's negative covenant," should be determinative or even persuasive here.

In no branch of the law is it more important that there be as much certainty as possible than in the field of taxes. Businessmen and their corporations must often make decisions involving future plans and the expenditure of large sums of money upon the advice of counsel as to the tax consequences of the contemplated transactions. The decision of the majority in the present case injects an unwarranted inconsistency into this field. In my opinion the Tax Court correctly construed the decisions in this as well as the other circuits referred to and its judgment below should be affirmed.